YODER FEED SERVICE AND CLARENCE YODER D/B/A YODER FEED SERVICE *v.* ALLIED PULLETS, INC.

[No. 3-374A38. Filed January 26, 1977.]

---

*Gregory A. Hartzler, Yoder, Ainlay, Ulmer & Buckingham,* of Goshen, for appellants.

*Thomas E. Warrick, Church, Meteiver, Warrick & Weaver,* of Elkhart, for appellee.

HOFFMAN, J.—Plaintiff-appellee Allied Pullets, Inc. brought an action for the conversion of 16,000 pullets against the defendant-appellant Clarence Yoder d/b/a Yoder Feed Service. Yoder counterclaimed for damages arising from an alleged breach of the contract between the parties. A trial to the court resulted in judgment for Allied with a partial judgment for Yoder on his counterclaim. Upon the overruling of his motion to correct errors, Yoder perfected this appeal asserting that the trial court erred in its findings of tortious conversion and in its refusal to entertain evidence in mitigation of the damages assessed thereon. Allied asserts an assignment of cross-errors in which it has prayed for additional damages.

The facts most favorable to appellee include the following: Allied is a firm in Upper Sandusky, Ohio, which contracts with growers to raise its female chickens during their first twenty weeks or pullet stage. After the pullets are sufficiently matured Allied sells them to poultry farmers to be placed in laying houses. On December 19, 1970, Allied entered into two written contracts with Yoder Feed Service of Goshen, Indiana. The first contract involved the raising of 6,275 pullets, hatched on January 14, 1971. This flock was kept by Yoder in the Lowell Weaver chicken house. The second contract called for 16,000 pullets to be raised from the time of hatching on January 19, 1971. This flock was kept by Yoder in the Glen Yoder chicken house. According to the terms of the agreements Yoder was to furnish the appropriate environment for raising the chickens in return for which he was to receive "payment according to the rate of 29 cents for each good pullet removed during the 16th week of age plus 1½ cents per week per pullet thereafter." These payments were to be made "not later than 21 days after [the] pullets are removed."

Originally the contracts had specified that Allied would supply the necessary feed. However, owing to the distance between the parties an oral agreement was made requiring Yoder to supply his own feed to the pullets in exchange for monthly payments by Allied.

On February 20, 1971, and March 24, 1971, Allied signed an agreement with Don Lewis of Galion, Ohio, and Donald E. Rager of Kenton, Ohio, for the sale of 10,880 and 6,144 pullets, respectively, to be delivered on June 7, 1971, at the price of $1.75 each. Allied anticipated using the pullets grown by Yoder at his Glen Yoder house under the second contract to fill the bulk of these two orders. Accordingly on May 12, 1971, Paul Geiser, president and principal shareholder of Allied, made an inspection of the pullets at the Glen Yoder house. He found them to be late in maturity, and registered

appropriate complaints. Geiser made other inspections on May 24, 1971, and on June 4, 1971, and was still dissatisfied. Finally, he decided to have the pullets retrieved and taken to the Ohio contractors on June 25, 1971. However the evidence also discloses that Clarence Yoder telephoned Geiser on June 2, 1971 and arranged to have the Glen Yoder flock removed by Allied and replaced with chickens from another hatcher during the week of June 7, 1971. Presumably since Allied failed to meet Yoder's expectations on June 7, 1971, he would not allow Geiser to remove any of the pullets on June 25, 1971, until he received payment of $12,680. Geiser offered to pay $4,700 for the feed Allied had purchased but refused more.

After negotiations failed between the parties, Allied filled the two Ohio contracts for layers with pullets from other portions of its own stock. Yoder retained the pullets from the Glen Yoder flock and began them as layers in different facilities.

The first question raised on appeal is whether Allied's complaint was based on an appropriate factual circumstance to support an action for conversion. Yoder asserts that Allied failed to make a demand sufficient to place Yoder in a position of wrongful possession. Yoder also maintains he was entitled not to release the pullets until grower payments and feed costs were remitted by Allied. In answer we note that conversion is a descendant of the common-law action of trover. It is a tort consisting of an appropriation of the personal property of another to a party's own use and benefit in exclusion and defiance of the owner's rights and under an inconsistent claim of title. *Seip* v. *Gray* (1949), 227 Ind. 52, 83 N.E.2d 790; *Prudential Ins. Co.* v. *Thatcher* (1936), 104 Ind. App. 14, 4 N.E.2d 574 (transfer denied). The essential elements which need to be proved by the moving party in order to maintain the action are an immediate, unqualified right to possession resting on

a superior claim of title. *Foley* v. *Colby* (1971), 148 Ind. App. 391, 266 N.E.2d 619; *Heeter* v. *Fleming* (1946), 116 Ind. App. 644, 67 N.E.2d 317.

In the case at bar, it is clear from the contract that the grower was responsible with the contractor for the development of the chickens. Under such circumstances when the possession originated through a proper exercise of right, it only becomes an unlawful conversion in derogation of the plaintiff's rights after he makes an unqualified request for their return. *Beaver Products Co.* v. *Voorhees* (1924), 81 Ind. App. 181, 142 N.E. 717. Thus, although Allied was the sole owner of the pullets, Yoder was in legal possession of them until Allied made a sufficient demand. *Deeter* v. *Sellers et al.* (1885), 102 Ind. 458, 1 N.E. 854.

The evidence most favorable to the appellee discloses that Earl Ruth, a vice president of Allied, called Yoder Feed by telephone on June 23, 1971. He advised the office manager that Allied would remove two truck loads of pullets from the Glen Yoder chicken house on June 25, 1971. However on the day when the trucks were scheduled to arrive, Clarence Yoder called Geiser at Upper Sandusky, and told him that none of the pullets could be removed until he received a certified check for $12,680. Geiser checked his records, called back, and offered $4,700. Yoder rejected the offer insisting upon a check for $12,680. Geiser thereupon contacted Ruth and another driver and stopped them before they drove to Goshen to pick up the pullets.

Under the circumstances of this case, when an owner has arranged for truckers to drive 200 miles to retrieve his property and must call one of them to return after making half the trip, it would be unrealistic to hold the formalities of the demand insufficient. Clarence Yoder's telephone call refusing the drivers was an affirmative tortious act. sufficient to sustain a complaint of conversion.

*Dodds* v. *Vannoy, Administrator* (1877), 61 Ind. 89; *Hanna and Another* v. *Phelps* (1855), 7 Ind. 21; *First Nat. Bank* v. *Ransford* (1914), 55 Ind. App. 663, 104 N.E. 604.

However as a defense Yoder asserts that tender of the debt for feed and grower payments was necessary in order for Allied to maintain the action. The rationale is that if the property is subject to a lien in favor of Yoder and is withheld therefor, it would have been necessary for Allied to tender the amount due Yoder as lienholder, otherwise Allied would not at the time of the alleged conversion be entitled to the immediate possession of the pullets. *Yeager and Sullivan, Inc.* v. *Farmers Bank* (1974), 162 Ind. App. 15, 317 N.E.2d 792.

Yoder claims this lien as a defense to the conversion based upon IC 1971, 32-8-29-1 (Burns Code Ed.), which states:

> "Feeding stock—Liens of liverymen and others.—The keepers of livery stables and all others engaged in feeding horses, cattle, hogs and other livestock, shall have a lien upon such property for the feed and care bestowed by them upon the same, and shall have the same rights and remedies as are provided for those persons heretofore having, by law, such lien in the act [32-8-30-1—32-8-30-8] to which this is supplemental."

This argument must fail when considered in light of evidence adduced at trial. The unpaid May feed bills were approximately $2,940.67. The total feed cost is ultimately found owing by the court with respect to the Glen Yoder and Lowell Weaver flocks as of June 25, 1971, was $4,956.22. Given that Yoder had a lien on the pullets for feed supplied, which Allied would have been required to satisfy prior to release of the pullets, the amount of that lien could be for no more than $4,956.22.

Although Allied's offer to pay the feed debt was $256.22 short of the amount due, the effect of this error is negated by Yoder's continued demand for $12,680 before the pullets would be released. Clearly, Yoder insisted on being paid for more than the feed and his insistence constitued conversion.

The refusal to accept Allied's tender of $4,700 on June 25, 1971, was unreasonable. In *Mockford* v. *Iles* (1940), 217 Ind. 137, 26 N.E.2d 42, where a mover had separate contracts for the transportation and the storage of certain household items, the court, at 144 of 217 Ind., at 46 of 26 N.E.2d, stated:

> "When a warehouseman refuses a proper demand for the delivery of goods upon the payment or the tender of the amount due him, and insists on the payment of excessive or improper charges before delivery, he thereby loses his lien upon the goods he has in storage and acts illegally and unlawfully in so refusing delivery."

Considering the case at bar in this context, it is important to note that the growers' fees were separate from the feed costs. An oral variation in the agreement was made to accommodate the distance between the parties so that Allied would pay for Yoder's feed in monthly installments. However the growers' fees remained as an integral part of the written contract. By its terms the grower payment for Yoder was based on the age and appearance of the pullets when removed, to be paid "not later than 21 days after the pullets are removed." Accordingly the grower payment could not be considered as part of that statutory lien amount.

The court in *Welker* v. *Appleman* (1909), 44 Ind. App. 699, 90 N.E. 35, addressed itself to a similar question. Appleman as an agent was obliged by contract to sack, store and load wool on railroad cars for shipment. An action for conversion against him for delaying the cars was denied because repayment of money advanced to Welker as principal was due upon delivery and enforceable as a lien. The court at 708 of 44 Ind. App., at 38 of 90 N.E., stated:

> "This contract is not to be confused with a contract where payment is to be made at a time subsequent to a delivery. In such case, the rule is that the agreement of such subsequent payment relinquishes the right to the lien, it being inconsistent therewith."

Thus Yoder's only viable lien was the statutorily created one for the cost of the feed used in raising the pullets. Allied's

substantial attempt to pay the feed cost, in light of Yoder's failure to render an appropriate billing for June, was adequate under the circumstances. The fact that some of the pullets were removed from the Lowell Weaver chicken house prior to the balance taken on June 8, 1971, cannot be said to have advanced the accrual date on the contract for the grower payment. Geiser testified that payment was to be made twenty-one days after the last pullet was removed. The evidence was sufficient to sustain the finding of the trial court that the contract payment for grower's fees was not due as of Allied's June 25 telephone call. Yoder therefore could not rightfully refuse delivery. *Hanna and Another* v. *Phelps, supra* (1855), 7 Ind. 21.

Yoder's next contention is that since the relationship between the parties was contractual, the remedies available were provided for by agreement and should be considered in light of the performance of both parties with respect to their mutual promises. In this context Yoder asserts that his contract with Allied was modified in a telephone conversation between Paul Geiser and himself on June 2, 1971, to the effect that Allied would remove the pullets in the Glen Yoder chicken house during their twentieth week. Yoder therefore asserts that he relied on Allied to his detriment in ordering new pullets and that since Allied failed to remove the old pullets within the time allegedly specified, he was deserving of damages assessed against the plaintiff.

However, other than the parties' oral agreement concerning the supply of feed, no mutually acknowledged variation in the written contract has been disclosed by the evidence. Clarence Yoder testified that the "chickens" he ordered from the Leavenworth hatchery would be delivered on June 25, 1971. Yet on June 23rd he told the hatchery that he would not take them; the same day that Allied notified him that it would remove its pullets on the June 25 date. The damages allegedly sustained by Yoder were therefore a result of his failure to

allow the pullets to be removed by Allied according to its plans.

The trial court apparently discounted Yoder's counterclaim by directly finding that Allied, through Paul Geiser, attempted to negotiate with Yoder on May 24, 1971, and again on June 4, 1971, concerning the maturity of the pullets relative to their removal. The testimony of Frank Greco, Jr., Yoder's office manager, corroborated these findings. Thus although there was no direct finding concerning the import of Yoder's June 2d telephone call to the Leavenworth hatchery, it can only be viewed as an additional piece of evidence considered by the trial court. Under these circumstances, Yoder's argument is essentially an invitation to this court to reweigh that evidence. This we cannot do. *Capitol Dodge et al.* v. *Haley et al.* (1972), 154 Ind. App. 1, 288 N.E.2d 766.

Moreover, where an election has been made to sue for conversion, the damages are for the wrongful tort of appropriating the property in question. *Pribble* v. *Kent and Another* (1858), 10 Ind. 325. In the case at bar there was an affirmative wrongful act by Yoder in refusing to release the pullets owned by Allied. Thus it is not a mere nonfeasance or failure to perform a duty imposed by contract. *Eagle Mach. Co., Inc.* v. *Amer. Dist. Tele. Co.* (1957), 127 Ind. App. 403, 140 N.E.2d 756 (transfer denied). Where a defendant repudiates the possession of goods under a contract with the plaintiff and converts them to his own use he may not claim the benefit of the contract in mitigation of damages; to do so would be to claim under inconsistent rights. *Backenstoss* v. *Stahler's Administrators* (1859), 33 Pa. 251; 18 Am. Jur., 2d, *Conversion,* §102, at 222.

The final issue raised on appeal concerns the propriety of the trial court's assessment of damages. In an action for conversion the measure of damages is generally the value of the converted property at the time of the conversion as determined by a fair market. *Daly* v.

*Nau* (1975), 167 Ind. App. 541, 339 N.E.2d 71 (transfer denied); *Hardy* v. *Heeter* (1951), 120 Ind. App. 711, 96 N.E. 2d 682. Although such a rule may vary according to the facts and circumstances of a particular case, these distinctions are usually based on the type of property involved. *Universal C.I.T. Credit Corporation* v. *Shepler* (1975), 164 Ind. App. 516, 329 N.E.2d 620 (transfer denied).

Allied contends in its assignment of cross-errors that its damages should include a compensation measured by the amount that the Ohio contractors had agreed to pay. However the evidence is conflicting as to whether such a measure would constitute the fair market value required by the circumstances of this case. *Universal C.I.T. Credit Corporation* v. *Shepler, supra.* Thus, after questioning the maturity of its pullets at the Glen Yoder house, to the extent of delaying their removal for fear that contract buyers would reject them, Allied cannot now be condoned in its effort to exaggerate the measure of damages for its own benefit. *Miller et al.* v. *Long* (1956), 126 Ind. App. 482, 131 N.E.2d 348, 132 N.E.2d 272 (transfer denied). Ample evidence was presented showing various prices paid for pullets at the time and place of conversion. *Sikora* v. *Barney et al.* (1965), 138 Ind. App. 686, 207 N.E.2d 846 (transfer denied).

For similar reasons Yoder's argument that the trial court erred in not admitting evidence of Allied's potential losses incurred under layer contracts as a mitigating circumstance in the assessment of damages must be denied. To include other risks involved in Allied's business improperly broadens the scope of a proper market value investigation of the property converted.

In *Sikora* when this court addressed itself to the issue of damages in an action for conversion, it was concluded at 692 of 138 Ind. App., at 850 of 207 N.E.2d, that,

"The amount of damages is largely within the discretion of the trier of the facts and will seldom be disturbed unless

there obviously exists prejudice, passion or partiality. *Miller* v. *Long, supra,* [126 Ind. App. 482, 131 N.E.2d 348], at pp. 496-497, citing *Oceana Oil Producers, Inc.* v. *Portland Silo Co.* (1951), 229 Ind. 656, 663, 100 N.E.2d 895. Appellant has made no showing of prejudice, passion or partiality by the trial judge and we will not weigh the evidence to reach a contrary conclusion as to the trial court's award of damages. Such award is therefore not erroneous."

The evidence necessary to sustain an action for common-law conversion was ample. The measure of damages has been reasonably calculated from the facts available. Accordingly, the judgment of the trial court must be affirmed.

Judgment affirmed.

Garrard, J., concurs.

Staton, P.J., concurs in result with opinion.


OPINION CONCURRING IN RESULT

STATON, P.J.—I concur in result. Allied made a prima facie case of conversion: (1) that it had exclusive rights of possion to the pullets; (2) it described the number of pullets in possession of Yoder under the contract; (3) Yoder's exercise of dominion over the pullets in defiance of Allied's right to possession; (4) that Yoder's acts were unauthorized or tortious; (5) damages sustained resulting from Yoder's acts. Yoder's evidence failed to rebut these five basic elements necessary for a recovery in conversion.

NOTE.—Reported at 359 N.E.2d 602.