THQ VENTURE, an Indiana general partnership, and THQ Venture II, an Indiana general partnership, Plaintiffs-Appellants,

v.

SW, INC., an Indiana corporation, f/k/a Stark Wetzel Foods, Inc., and Stark Wetzel & Co., Inc.; Sagamore Park Farms, Inc., an Indiana corporation; Premier Angus, Inc., a Michigan corporation; and Granada Land & Cattle Co., Inc., a Texas corporation, Defendants-Appellees.

Robert M. BOWES, II, d/b/a Bowes Farms, Plaintiff-Appellant,

v.

SW, INC., an Indiana corporation, f/k/a Stark Wetzel Foods, Inc., and Stark Wetzel & Co., Inc.; Sagamore Park Farms, Inc., an Indiana corporation; Premier Angus, Inc., a Michigan corporation; and Granada Land & Cattle Co., Inc., a Texas corporation, Defendants-Appellees.

No. 1–1281A366.

Court of Appeals of Indiana, First District.

Jan. 27, 1983.

Thomas A. Withrow, Lawrence W. Inlow, Diane Hubbard Kennedy, Henderson, Daily, Withrow, Johnson & Gross, Indianapolis, James L. Goodwin, Lebanon, for plaintiffs-appellants.

Douglas B. King, Katherine L. Shelby, Wooden, McLaughlin & Sterner, Eric R. Johnson, Sommer & Barnard, P.C., James A. Strain, John J. Kish, Barnes & Thornburg, Indianapolis, for defendants-appellees.

1. SW was formerly known as Stark-Wetzel Foods, Inc. and Stark-Wetzel & Co., Inc. The entity will be referred to as SW in the opinion.

ROBERTSON, Presiding Judge.

THQ Venture, THQ Venture II, and Robert Bowes (hereinafter referred to as investors) appeal the granting of a motion to dismiss in favor of the defendant-appellees SW, Inc. (SW),[1] Sagamore Park Farms, Inc. (Sagamore), Premier Angus, Inc. (Premier Angus), and Granada Land & Cattle Co., Inc. (Granada). The investors allege that SW and the other defendant-appellees breached cattle breeding contracts and that their activities constituted conversion.

We affirm.

THQ Venture and THQ Venture II are general partnerships consisting of the same three individuals as partners. Prior to entering the contracts, the investors examined SW's offering circular, which explained the investment offering. The circular contained a projection of earnings for seven years.

The investors entered into three cattle breeding contracts with SW. The contracts were identical in all relevant portions except that THQ Venture II entered into its contract on January 3, 1972. THQ Venture and Bowes executed their contracts on January 1, 1971. The contracts provided that each investor group would purchase a herd of Aberdeen Angus heifers and an interest in a bull from SW, who contracted to care and maintain the cattle. As consideration for these services, SW was to receive every second calf born to the herds and to the herd's progeny thereafter.

The contract included the following option and sales provision:

9. *Sale:* Stark, Wetzel recognizes that Owner[2] has the right to sell any animal in the Herd at any time Owner so desires. Stark, Wetzel shall have a first option to purchase any cattle offered for sale by the Owner, at book value in the case of cattle in the original herd, and at a price of $1,200 for bred cows and $900 for year

2. The term "Owner" in the contract refers to the investors.

old bulls in the case of progeny of the original herd. Stark, Wetzel agrees that, in the event it does not purchase any animals offered for sale by the Owner, it will assist in the sale of Owner's animals or act as broker therefor, and for such services, Stark, Wetzel will accept and Owner agrees to pay a sum equal to 10% of the proceeds of any such sale, after deducting sales expenses. If sale of cattle is not effected by Stark, Wetzel within 60 days after notice by the Owner of intention to sell, Owner shall have the right to sell on its own account or offer for sale through other agents or dealers. Stark, Wetzel will guarantee sale or repurchase of cattle at its option price, provided such sales are made in accordance with the projection attached hereto as Exhibit C, or within any deviations from such projection approved in writing by Stark, Wetzel, and including sale or repurchase of Owner's herd at the expiration of the term of the maintenance contract.

The contract also contained a provision governing the term and extension of the contract:

This agreement shall commence as of the date hereof, and shall continue for a period of five years. Anything to the contrary notwithstanding, the Owner herein may at any time cancel this agreement by giving Stark, Wetzel 30 days written notice of such cancellation, by registered or certified mail, in which event this agreement shall terminate at the expiration of such 30 days with the same force and effect as if that were the original termination date set forth herein; provided, however, that upon any such termination, Stark, Wetzel shall be entitled to its share of all calves dropped within five months from the effective date of termination attaining the age of three months, and this agreement shall not terminate as to this right until all obligations of Owner to Stark, Wetzel in connection therewith are duly performed. An option is herewith given to Owner to extend this agreement for an additional period of five years, provided that not

later than six months prior to the termination of this agreement Owner shall have notified Stark, Wetzel in writing by registered or certified mail, return receipt requested, of the exercising of said option.

SW sold the investors' contracts to Sagamore's predecessor in 1973 and Sagamore agreed to provide the necessary services to fulfill SW's duties. It took possession of the herds and maintained them. Sagamore's predecessor merged with PFS, Inc. and became Sagamore Park Farms, Inc. In 1975, Sagamore entered into an asset purchase agreement with Granada. Pursuant to this agreement, Granada purchased the investor contracts. At the time Granada executed this agreement with Sagamore, Granada purchased 79% of the voting stock of Premier Angus from Premier Corporation. The investors' contracts were then contributed to Premier Angus by Granada.

The investors did not renew the contracts and on November 16, 1976, they were notified that herds would be sold to satisfy an agister's lien in Nebraska. On April 14, 1977, the investors were informed of the impending sale, which subsequently occurred on April 18 and 19, 1977.

The investors filed their complaints on March 8, 1977. A pre-trial conference was held on October 25, 1979, in which the trial court scheduled the trial for May 26, 1980, with a final pre-trial conference for April 25, 1980. A discovery cutoff date of March 25, 1980, was also established by the trial court. Pursuant to the investors' motion, the trial court extended the deadline for the witness list and statement of contentions from February 25, 1980, until April 10, 1980.

The investors also sought to amend their complaints on February 22, 1980, for the purpose of adding Premier Corporation as a defendant. The trial court granted the motion that same day. SW filed its motion in opposition to the amended complaint. On March 25, 1980, the investors moved to enlarge the discovery period in order to depose officers of Premier and to seek an

accounting. The trial court granted the investors until May 2, 1980, to complete discovery.

On April 24, 1980, the investors moved to continue the trial, which was granted. The trial was rescheduled for November 20, 1980, and the parties were required to file witness lists and their statements of contentions by October 27, 1980. On November 6, 1980, the investors moved to file an amended complaint. The November trial date was continued until December 11, 1980, on the motion of SW. The trial court also granted SW's motion to strike the amended complaint and denied the investors' motion to reconsider this matter. The investors also filed a request for admission and for another continuance in November, 1980.

The trial was later continued until April 9, 1981. On March 20, 1981, the investors filed a motion for deposition, which was granted that day. Granada, Premier Angus, and Sagamore sought reconsideration of said motion on March 23, 1981. The trial court vacated its prior ruling and denied the discovery.

The trial began in April as scheduled. SW and the other defendant-appellees moved to dismiss at the closing of the investors' evidence. The trial court granted the motion and the investors appeal.

In ruling upon a motion to dismiss pursuant to Ind. Rules of Procedure, Trial Rule 41(B) as it existed at the time of trial,[3] the trial court could only consider the evidence and inferences most favorable to the nonmovant and determine whether there was substantial evidence of probative value to sustain the material elements of the nonmovant's complaint. *Stephenson v. Frazier,* (1980) Ind.App., 399 N.E.2d 794. In making this determination, the trial court could not weigh the evidence nor weigh conflicting portions of the testimony of the same witness. *Ferdinand Furn. Co., Inc. v. Anderson,* (1980) Ind.App., 399 N.E.2d 799.

■ The investors proceeded upon two theories of recovery: breach of contract and conversion.[4] Although the investors recognize the contracts contained a five year term, they argue that SW was obligated to guarantee the contracts in the sixth and seventh years. The investors contend that progeny born in the fourth and fifth year would mature and be subject to the sale price of the contract in the sixth and seventh year. In essence, the investors argue that the progeny splitting agreement was to last for five years, but that maintenance and payments were to extend for seven years. They assert that the earnings projection supports their interpretation because it contains projections for the sixth and seventh year.

The earnings projection was originally part of the offering circular, but it was integrated into the maintenance agreement because it was specifically referred to as Exhibit C in the sale provision and attached to the contracts. The earnings projection consisted of a chart which listed the predicted size of the herd, expected tax savings, capital gains tax, receipts, disbursements, net costs, total costs, and the return on investment for seven years.

■ Although the investors' argument is a logical extension of the contracts, we believe the express language of the contracts governs the present case. There is nothing within the contracts or the earnings projection which contradicts or creates any ambiguity regarding the duration of the contract. The earnings projection is a naked chart devoid of any language indicating SW was obligated to purchase cattle for two years beyond the five year term. Where no defect in the formation of a contract is alleged, the language of the contract, if unambiguous, is conclusive upon the question of the parties' intentions. *Marksill Specialties, Inc. v. Barger,* (1981) Ind.App., 428 N.E.2d 65. Words used in a contract must be given their common mean-

---

3. The rule has been subsequently amended.

4. It must be noted that the investors have not alleged that the statements within the circular constituted a material misrepresentation or that a securities claim was at issue.

ing unless, from the entire contract and the subject matter thereof, it is clear that some other meaning was intended. *Piskorowski v. Shell Oil Co.,* (1980) Ind.App., 403 N.E.2d 838. The contracts' language expressly limited its term to five years. This language is unambiguous and this court cannot rewrite the contracts' provisions. *Wills v. Gaff,* (1963) 136 Ind.App. 21, 191 N.E.2d 41.

■ The contract claim fails for another reason. The sales provision gave SW the first option to purchase the cattle after the investors provided notice of their intent to sell the cattle. SW's obligation to guarantee the sale price would only arise after it received notice and decided not to exercise its purchase option. SW then had sixty days to broker and sell the cattle. If it failed to sell the cattle within that time, the investors could sell the cattle themselves. SW's obligation to guarantee the contract price was dependent upon SW's sale of the cattle or a subsequent sale by the investors.

The investors [5] acknowledge that written notice of their intent to sell was not made, they submit that this provision was waived by the course of conduct by the parties. The investors argue that whether the notice requirement was waived is a question of fact which would preclude the granting of dismissal pursuant to T.R. 41(B) as it existed at that time. There is a scarcity of evidence regarding the notice. However, even if we accept the investors' argument, their claim still fails because there is no showing that SW was given the opportunity to sell the cattle or that the investors sold the cattle themselves. A condition precedent has been defined as a condition which must be fulfilled before the duty to perform an existing contract arises. See *Blakley v. Currence,* (1972) 172 Ind.App. 668, 361 N.E.2d 921. The investors did not satisfy the conditions precedent and therefore, SW's duty did not arise.

■ The investors also proceeded upon a conversion theory at trial. They argue that the contracts constituted a bailment, that the defendant-appellees had a duty to return the cattle and that the duty was breached when the cattle were sold to satisfy an agister's lien. SW argues that the contract did not impose a duty upon SW to return the cattle, that the investors failed to demand the return of the cattle and that the investors failed to establish their damages with proper evidence.

■ The contracts did not contain any language requiring SW to return the cattle. The contracts had expired. Even if a duty to return the cattle is imposed upon SW, the investors are not entitled to relief because they failed to demand the return of the cattle. The requirement of demand is necessary as evidence of conversion where the defendant-bailee comes into lawful possession of the property. *French v. Hickman Moving & Storage Co.,* (1980) Ind.App., 400 N.E.2d 1384. When the possession originates through a proper exercise of a right, conversion in derogation of the plaintiff-bailor's rights occurs after the plaintiff makes an unqualified request for a return of the property. *Yoder Feed Service v. Allied Pullets, Inc.,* (1977) 171 Ind.App. 692, 359 N.E.2d 602. The evidence clearly establishes that SW came into possession lawfully. The investors failed to demand the cattle and the trial court properly dismissed this claim.

■ The investors also submitted an incorrect measure of damages which precludes their tort claim. They submitted the size of the herd calculated at the date of trial and the fair market value for the various ages of cattle calculated at the trial date. The investors, in their reply brief, argue that the damages can be calculated from the contracts. The investors also contend that they are entitled to lost profits because both the herd and the progeny would continue to reproduce.

---

5. THQ Venture II received its last payment in March, 1976. The investors assert that the term of THQ Venture II did not expire until January 3, 1977, and therefore, they argue that SW is liable for the remainder of the contract. While the investors' assertion is correct, SW is not liable because of the investors' failure to satisfy the conditions precedent.

■ The general rule as to damages in an action for conversion is that damages are measured by the fair market value of the property calculated at the time of conversion with interest from the date of conversion. *Universal C.I.T. Credit Corp. v. Shepler,* (1975) 164 Ind.App. 516, 329 N.E.2d 620. The contract price was irrelevant because the contracts had expired. Although lost profits may be allowed in exceptional circumstances to avoid injustice, *Newhart v. Pierce,* 62 Cal.Rptr. 553, 254 Cal.App.2d 783 (1967), there has been no showing of such circumstances to justify additional damages. There was no showing that SW converted the herds for its own use because the alleged conversion was the execution of agister's lien by a third party. Moreover, the investors failed to take any action to prevent the execution of this lien even though they were given notice. The investors failed to establish the proper measure of damages, thus, the trial court properly dismissed this count.

■ The investors contend in their brief and in their motion to correct errors that the activities of SW and the other defendant-appellees constitute constructive fraud. The investors did not proceed upon this theory at trial. In both the opening and closing statements, the counsel for the investors stated they were proceeding upon two theories; breach of contract and conversion. The parties are bound by the theories upon which the case was tried. *City of Evansville v. Bartlett,* (1962) 243 Ind. 464, 186 N.E.2d 10. This theory is not properly before us.

■ The investors allege the trial court erred in denying a motion to depose D.R. Painter, who was the President of the American Angus Association. A trial court exercises judicial discretion in ruling upon discovery issues and appellate review is only available for an abuse of discretion. *Geib v. Estate of Geib,* (1979) Ind.App., 395 N.E.2d 336. In the present case, the action was pending for almost four years prior to the investors' motion and it was made beyond the discovery cutoff date, just twenty days before trial. We cannot agree that the trial court abused its discretion in light of these circumstances.

■ The investors also allege that the trial court erred in striking their amended complaint. SW alleges a similar error in that the trial court denied it leave to file a counterclaim after the dismissal. The grant or denial of leave to amend a claim is a matter within the sound discretion of the trial court and is reviewable only for an abuse of discretion. *Hargis v. United Farm Bureau Mut. Ins. Co.,* (1979) Ind.App., 388 N.E.2d 1175. We remain unpersuaded that the trial court abused its discretion in light of the fact that SW sought to file counterclaims after the dismissals and that the investors sought leave to amend its complaint two weeks prior to a November trial date and did not renew this motion prior to trial.

The judgment is affirmed.

NEAL, J. concurs.

RATLIFF, J., concurs in result.