**Peter MANZON, Plaintiff,**

v.

**STANT CORPORATION, Defendant.**

**No. IP 99–1789–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 30, 2001.

Mary Lee Schiff, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, for plaintiff.

Michael A Moffatt, Barnes & Thornburg, Indianapolis, IN, for defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

Plaintiff Peter Manzon was an executive employee at Defendant Stant Corporation ("Stant") from October of 1996 to spring of 1999. The terms of his employment were governed by an Employment Agreement. Soon after Manzon's employment was terminated in 1999, he filed suit against Stant alleging that Stant failed to honor its obli-

gations under the Employment Agreement and that Stant violated certain wage laws in effect in Indiana. Defendant responded by filing a counterclaim against Manzon alleging that Manzon criminally converted a vehicle owned by the company and in Manzon's possession through an employee automobile program. Before the Court are various motions for summary judgment. For the reasons set forth below, the Court *GRANTS* in part and *DENIES* in part Defendant's Motion for Partial Summary Judgment and *GRANTS* Plaintiff's Cross Motion for Summary Judgment on Stant's Counterclaim. The Court also *DENIES* Plaintiff's Motion to Strike.[1]

### Background Facts

Manzon worked at Stant as the Executive Vice President and General Manager of Standard–Thompson Corporation, a wholly owned subsidiary of Stant. The terms and conditions of Manzon's employment were governed by an Employment Agreement signed October 31, 1996. This contract established, among other provisions, that Manzon would receive a base salary and that he would be eligible to participate in an annual incentive compensation plan for executive employees. Employment Agreement, Section 2, attached as Ex. 1 to Wiggins Aff. Also relevant here, the contract provided for Manzon's participation in the company's automobile incentive program. Finally, the Employment Agreement included various provisions regarding his compensation should Manzon's employment be terminated following a change of control of the company. In May of 1997, Tomkins Corporation acquired Stant, and in March of 1999, James D. Wiggins, the President of Stant, notified Manzon that his employment was terminated. These events put into effect the last of these contract provisions noted above. Disagreements over the meaning and application of the Employment Agreement brought about this litigation. Additional facts will be discussed where relevant to the legal analysis.

### Stant's Motion for Summary Judgment on Statutory Wage Claim

In Count I of his complaint, Manzon sues his former employer for incentive compensation[2] allegedly due to him under his Employment Agreement. In Count II, Plaintiff also maintains that this amount falls within the meaning of "wages" as that term has been defined by courts interpreting the laws of Indiana. If this amount is a wage as legally defined, then Indiana

---

1. Plaintiff asks the Court to strike Defendant's "Introduction" and "Statement of the Case" in Defendant's Brief in Support of Motion for Partial Summary Judgment ("Defendant's Brief") on the ground that "these portions of the brief contain numerous factual assertions which are not substantiated by specific citation to record evidence." Plaintiff's Motion to Strike at 1. We first note that Local Rule 56.1(f)(2) requires only that each fact set forth in a Statement of Material Facts shall be substantiated by specific citation to record evidence. It does not require that the briefs do so. We also remind counsel that the Court knows how to recognize and appropriately disregard rhetoric, whether it be in a brief or in a Statement of Material "Fact."

2. For reasons that will become clearer as discussion of the controversy progresses, Stant refers to the amount at issue as a "severance benefit" and as a "bonus" distributed under the "Management Bonus Plan," while Plaintiff refers to its as "earned incentive compensation." *See, e.g.,* Defendant's Brief at 1; Facts, ¶¶ 13, 34. This use of terminology is an interesting rhetorical practice, but we are not distracted by it. Like the court in *Gurnik v. Lee,* 587 N.E.2d 706, 709 (Ind.Ct. App.1992), "we will look to the substance of the compensation" rather than to the "mere[ ] labeling" of the compensation. For the sake of consistency and clarity, we refer to the amount at issue as "incentive compensation." The Employment Agreement also uses this term. *See, e.g.,* Employment Agreement, Section 2(b).

Code § 22–2–5–2 would entitle Manzon to double the amount of compensation due to him and to costs and attorney's fees. Stant's Motion for Partial Summary Judgment addresses only the second count. For this reason, the Court will examine whether the amount at issue is a wage, while taking no position on whether Manzon is entitled to the amount under his Employment Agreement.

■ Sections 22–2–5–1 and 22–2–5–2 of the Indiana Code do not explicitly define wage, but courts have used legislative history and other sections of the Indiana Code to determine which types of compensation are a wage. *See, e.g., Die & Mold, Inc. v. Western,* 448 N.E.2d 44, 47 (Ind.Ct. App.1983) (vacation pay is a wage); *Wilson v. Montgomery Ward & Co., Inc.,* 610 F.Supp. 1035, 1038 (N.D.Ind.1985) (severance pay is not a wage).

One case in particular is instructive here. In *Herremans v. Carrera Designs, Inc.,* 157 F.3d 1118, 1121–22 (7th Cir.1998), the Seventh Circuit determined that the plaintiff's claim for pay based on the annual performance of the plant he managed was a bonus, rather than a wage as covered by Indiana Code § 22–2–5–2. The *Herremans* court looked to Indiana Code § 22–2–9–1(b), which defines wage as "amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or in any other method of calculating such amount."[3] Based on this definition, the Seventh Circuit reasoned that because the plaintiff's disputed pay was not based on "his own time or effort or product, ... but on the profits of his plant," the plaintiff's

pay was a bonus, rather than a wage. *Herremans,* 157 F.3d at 1121–22.

The same reasoning applies to the facts before the Court. The Employment Agreement establishes that "Executive shall participate in an annual incentive compensation plan for executives ... whereby Executive shall have the opportunity each year to earn a cash bonus in an amount of up to 50% of the Base Salary for such year based upon *the attainment of financial targets established by the Company and/or STC* and the achievement of individual personal objectives." Employment Agreement, Section (2)(b) (emphasis added). As in *Herremans,* the Manzon's incentive compensation was based, in part, on the success of the company as a whole.

Manzon attempts to distinguish his case, claiming that in *Herremans* and other cases holding that bonuses were not wages, "the compensation at issue was *solely* tied to the overall performance of the defendant company." Plaintiff's Response Brief at 16. Manzon argues that his compensation was based in part on his own performance and is therefore a "wage" under the statute. *Id.* It is certainly true that the Employment Agreement conditioned his pay not only on the success of the company but also on "the achievement of individual personal objectives." Employment Agreement, Section 2(b). However, we do not agree that the principle enunciated in *Herremans* was meant to be as limited as Manzon argues it should be. In any situation in which additional pay is based on the success of the company, the reasonable assumption is that the employee receiving additional pay somehow contributed to that success

---

**3.** While § 22–2–9–1(b) is not directly part of the statute allowing for double damages, costs and attorney fees, *see Wilson,* 610 F.Supp. at 1038 (discussing different legislative histories of sections 22–2–9–1(b) and 22–2–5–2), it is one of the legislature's few attempts at defining the term and is instructive for that reason.

through his own performance. The Employment Agreement in this case serves to make that assumption explicit.

*Herremans* is instructive for another reason. The Seventh Circuit decided that because the plaintiff's disputed pay was based on a share of the *annual* profits of the plant, this amount could not be considered a wage. *Herremans*, 157 F.3d at 1121–22. Indiana Code §§ 22–2–5–1 and 22–2–5–2 combine to impose double damages, costs, and attorney's fees when wages are not paid within ten days of the date they are earned. Surmising that "[o]rdinarily it would take weeks [rather than the statutorily decreed ten days] to determine a plant's profits for the year just ended," the Seventh Circuit concluded that the legislature could not have intended to impose such harsh penalties for failure to accomplish a near-impossible task. *Id.* Here also incentive compensation was paid annually based on the success of the company during the past year. In fact, executives generally received their incentive compensation about four months after the end of the fiscal year, which far exceeds the ten days the statute sets forth for wages. Facts, ¶ 13. Plaintiff has not argued (and cannot do so reasonably) that Stant should be penalized under the statute for all of its "late" payments of incentive compensation over the years.

That infrequent, although regular, disbursements of incentive compensation do not qualify as "wages" is also supported by *Jeurissen v. Amisub, Inc.*, 554 N.E.2d 12, 13 (Ind.Ct.App.1990). In that case, the court adopted a narrow definition of wages as "something akin to the wages paid on a regular periodic basis for regular work done by the employee-the paycheck which compensates for the work done in the previous two weeks." *Id.* Based on this definition, the court found that additional compensation payable in a lump sum every six

months and based on the financial success of the employer was a bonus rather than a wage subject to the additional damages and attorney fees under Indiana Code § 22–2–5–2. *Id.* The annual incentive compensation payments made here are indistinguishable from those in *Jeurissen.* For these reasons, Stant is entitled to summary judgment on Manzon's statutory wage claim.

*Cross Motions on Conversion*

In response to Manzon's lawsuit, Defendant Stant filed a counterclaim for conversion under the Indiana crime victim's relief statute, Indiana Code § 34–24–3–1. Answer, §§ 7–8. Stant alleges that Manzon failed to return a 1999 Jeep Grand Cherokee the company had given him for his use during the period of his employment, in violation of the Indiana statute prohibiting conversion, Indiana Code § 35–43–4–3. Defendant's Reply at 8. The parties have filed cross motions for summary judgment on this issue. Analysis of the contract between Stant and Manzon in light of judicial interpretation of the law against conversion establishes that Manzon is entitled to summary judgment on Stant's counterclaim.

 Criminal conversion is committed when "[a] person ... knowingly or intentionally exerts unauthorized control over property of another person." Ind.Code § 35–43–4–3. A person suffering pecuniary loss as a victim of criminal conversion can sue for the costs of the action, attorney's fees, and treble damages. Ind.Code § 34–24–3–1. Recovery on this theory in a civil action does not require a criminal conviction. *Huff v. Biomet, Inc.*, 654 N.E.2d 830, 835 (Ind.Ct.App.1995). Instead, the "claimant need only prove by a preponderance of the evidence that the criminal act was committed by the defendant." *Squires v. Utility/Trailers of Indianapolis, Inc.*, 686 N.E.2d 416, 420 (Ind.

Ct.App.1997). Conversion consists of two key elements. First, the claimant must prove that the control exercised over the property was unauthorized. *Midland–Guardian Co. v. United Consumers Club, Inc.,* 499 N.E.2d 792, 797 (Ind.Ct.App. 1986); *Agristor Leasing v. McIntyre,* 150 F.R.D. 150, 151 (S.D.Ind.1993). Second, the claimant must show that the accused "was aware of a high probability that this control was unauthorized." *Midland–Guardian,* 499 N.E.2d at 798. *See also Agristor,* 150 F.R.D. at 151.

*Control Authorized*

█ The language of the controlling contract in this case precludes Stant from establishing the first element. The Employment Agreement governing the relationship between Stant and Manzon refers to the program through which Manzon received use of the Jeep Cherokee. One of the clauses at issue is as follows:

> *Fringe Benefits; Vacation.* Executive shall participate in the Company's *automobile program and all other fringe benefits* to the same extent as other senior executives of the Company or STC.

Employment Agreement, Section 2(d) (emphasis added). By referring to "all other fringe benefits" in the same clause as the automobile program, it appears that the automobile program is a fringe benefit. There is nothing else to which the word "other" in the sentence could refer as inclusive in the term "fringe benefit."

As a fringe benefit, Manzon's continued control of the car was authorized because the Agreement also states that in the event of termination, Stant shall "[p]rovide Executive all fringe benefits which the Company was providing to Executive on the Measurement Date until the Twenty Four Month Benefit Termination Date." Employment Agreement, Section 4(c)(xii).

The Measurement Date is "sixty (60) days prior to the Termination Date." Employment Agreement, Section 4(b)(ix). The Termination Date was the effective date of Manzon's employment termination, which the parties agree was May 31, 1999. The Measurement Date, therefore, was April 1, 1999. The uncontroverted evidence shows that on April 1, 1999, Stant "was providing" to Manzon the fringe benefit of participation in the automobile program. By the terms of the contract, then, Manzon's use of the Jeep Cherokee is authorized until May 31, 2001, twenty-four months following the Termination Date. By its terms, Section 4(c)(xii) measures the fringe benefits that Stant will continue to provide to Manzon by the fringe benefits it was providing him sixty days prior to his termination. On this ground, not only does Stant fail to meet its burden for summary judgment in its favor, but also Manzon establishes that he is entitled to summary judgment in his favor.

In an effort to establish that Manzon's control over the vehicle was unauthorized during the time period in question, Stant makes an argument unsubstantiated by the facts before the Court. Based on the Agreement language stating that Manzon is entitled to fringe benefits "to the same extent as other senior executives," Stant argues that other senior executives who are terminated must also return any vehicles they used through the automobile program. Defendant's Reply at 9. To support Stant's argument, Charlene Hoover, manager of the corporate fleet for the company, affirms that "[c]ompany policy requires employees to return company vehicles upon their termination from Stant." Neither Hoover nor anyone else cites to a written policy laying out this company policy or to any other terminated executive who was required to return her car to the company, which would leave the veracity of

Hoover's statement to the judgment of the jury. However, this statement will not get to a jury because Stant's argument fails to address the crux of the contract's language. It may be that company policy or past practice generally requires executives to return company cars upon termination, but that is not what Stant's contract with Manzon provides. Instead, the Employment Agreement obligates Stant to provide Manzon with whatever fringe benefits he enjoyed sixty days prior to his termination. Even if Hoover's affidavit is truthful, this argument fails, and Manzon is entitled to summary judgment on the issue of conversion.

*Failure to Establish Requisite Mens Rea*

■ The Court's examination of the *mens rea* element of conversion will be brief as Manzon's control of the vehicle was authorized, thereby defeating one element required in the crime of conversion. What Stant needs to show to establish this element of the crime of conversion is that Manzon "was aware of a high probability that this control [over the Jeep Cherokee] was unauthorized." *Midland–Guardian,* 499 N.E.2d at 798. *See also Baker v. R & R Constr., Inc.,* 662 N.E.2d 661, 666 (Ind. Ct.App.1996), *trans. denied* ("There can be no reasonable dispute that criminal intent is an essential element which must be proved [sic] in . . . conversion."). This burden is high because, as a punitive statute, the victim's relief statute, Indiana Code § 34–24–3–1, should be strictly construed. *NationsCredit Commercial Corp. v. Grauel Enterprises, Inc.,* 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998).

■ Stant cites to a letter from Manzon's counsel, Mary Lee Schiff, to Mary Kloepfer, Stant's counsel, in its attempt to show that Manzon had the requisite state of mind. Letter from Schiff to Kloepfer, dated July 12, 1999, attached as Ex. 3 to Kloepfer Aff. Even if we assume, for purposes of this discussion, that Manzon's control over the vehicle was unauthorized (contrary to our findings above), this letter does not support Stant's conclusions. In the letter, Schiff writes:

> [w]ith regard to the company car Peter is using, under paragraph 4(c)(xii) of his Employment Agreement, Stant is obligated to provide him with all of the fringe benefits which it was providing him on the date of his termination for a period of two years. Hence, we see no merit to your demand that Peter return his company car to you or forward payment for this vehicle. For your information, Peter plans on purchasing this car with the purchase price being deducted from the amount Stant owes him pursuant to his Employment Agreement.

Stant claims that Manzon's refusal to return the car in the face of an explicit demand satisfies the state-of-mind element of criminal conversion. Defendant's Brief at 14 (citing *THQ Venture v. SW, Inc.,* 444 N.E.2d 335, 339 (Ind.Ct.App.1983))[4]. To the contrary, Manzon's response sets forth the contractual basis for Manzon's belief that his use of the car is authorized. "It is precisely this *mens rea* that differentiates criminal conversion from the more innocent breach of contract . . . that the criminal conversion statute was not intended to cover." *NationsCredit,* 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998). This letter demonstrates Manzon's belief that he had a contractual right to the Jeep Cherokee, not Stant's contention that Manzon was aware of a high probability that his control

---

4. Defendant's reading of *THQ Venture* overstates its holding. The *THQ Venture* court did not conclude that demand and refusal was all that was needed to prove state of mind because it did not need to reach that question; the claimants had not made any demand. *THQ Venture,* 444 N.E.2d at 339.

over the vehicle was unauthorized. Manzon reasonably (and accurately, as it turns out) believed his continued use of the Jeep Cherokee was authorized, thereby defeating the *mens rea* requirement of conversion.[5] Because there is no genuine issue of material fact concerning whether Manzon converted the vehicle, Manzon is entitled to summary judgment.

### Conclusion

For the reasons stated above, Defendant's Motion for Partial Summary Judgment is *GRANTED* with respect to Count II of Plaintiff's Complaint. Defendant's Motion for Partial Summary Judgment is *DENIED* with respect to Stant's counterclaim for conversion. Plaintiff's Cross Motion for Summary Judgment is *GRANTED*.

---

5. Stant's argument that the last sentence of the above quote constitutes a "ransom" demand also fails. Defendant's Reply at 9–10 (citing *Yoder Feed Service v. Allied Pullets, Inc.*, 171 Ind.App. 692, 359 N.E.2d 602, 605–606 (1977)). While Manzon has use of the car until May 31, 2001, he has use of it only until that date. Depending on how satisfied he is with his Jeep Cherokee, Manzon may want to drive it for years to come. In that case, he will need to purchase it from Stant, just as the letter states.