In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-2418 & 09-2482

LOUIS AND KAREN METRO FAMILY, LLC, *et al.*,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

LAWRENCEBURG CONSERVANCY DISTRICT, *et al.*,

*Defendants-Appellants,*
*Cross-Appellees.*

Appeals from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:06-cv-177-WGH-DFH—**William G. Hussman**, *Magistrate Judge.*

ARGUED DECEMBER 7, 2009—DECIDED JULY 29, 2010

Before CUDAHY, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Louis and Karen Metro would like very much to acquire some land that they believe the City of Lawrenceburg, Indiana, and the Lawrenceburg Conservancy District promised to convey to them. The option contract their company held, however, was pre-

mised on the construction of a flood control project that the City and the District had planned. When that project was abandoned, the District told the Metros that their option could no longer be exercised. This lawsuit, brought under the diversity jurisdiction, asserts that the City and the District breached their contract with the Metros' business. The district court found for the plaintiffs and ordered reformation of the option contract to extend the date by which the option could be exercised, but it rejected the Metros' request for money damages on the ground that their proof of injury was too speculative. We agree with the district court that the contract was breached. The remedy that the court ordered, however, needs some additional attention, and so we remand for that limited purpose.

## I

Louis and Karen Metro are both citizens of Ohio. They are the sole members of a limited liability company, Metro Family, LLC, that owns properties and rents them to businesses in Ohio and Indiana. Southern Ohio Pizza, an Ohio corporation that the Metros own, operates Domino's Pizza franchises in properties that it leases from Metro Family. One of its pizza shops was located on the west bank of Tanners Creek, which is a tributary of the Ohio River. Tanners Creek bisects Lawrenceburg, which itself is situated at the point where Ohio, Indiana, and Kentucky meet.

Several times during the 20th century, floods have surged down the Ohio River from the east and have

overwhelmed the river's tributary system and the adjacent towns. In 1997, a particularly bad flood hit Lawrenceburg, prompting the City to entertain the idea of building a new levee. It turned to the District to carry out any such plans. In 2000, the City and the District inaugurated the Westside Flood Protection Project, which had the goal of building a flood wall along the west bank of Tanners Creek, just where Metro Family's property (on which a pizza shop was operating) was located. In order to fund the project, the City and the District entered into a contract entitled the Extension of Revenue Sharing Agreement, dated December 21, 2000, under which each party promised to use the revenue from a riverboat casino for that purpose.

This arrangement enabled the District to move forward with the acquisition of land along Tanners Creek. One parcel it needed was the spot where Metro Family had its Domino's franchise. It notified the Metros that it intended to acquire the property using its eminent domain powers. About ten months later, a professional appraiser concluded that the fair market value of the property was $417,000.

In the meantime, as required by Ind. Code § 32-24-1-5, the District sent an offer to Metro Family to purchase the property for $417,000. The Metros were not satisfied with this offer, and so negotiations ensued. On July 19, their lawyer counteroffered for terms calling for Metro Family to receive $417,000 and an option contract. The District accepted the counteroffer, and the parties signed the modified agreement on October 31, 2001. Paragraph 2 read as follows, in relevant part:

At the time of closing, which shall occur on or before November 30, 2001, District shall execute an irrevocable Option in favor of Metro [Family] wherein Metro shall have the right to purchase 0.827 acres of the real estate described in Exhibit A and the adjoining 0.555 acres . . . for a purchase price of . . . $269,490.00 . . . . [The option] shall be exercisable for a period of eighteen (18) months commencing with the date written notice of Substantial Completion of the District's facilities is given by the District to Metro by registered mail . . . .

Exhibit A contained the legal description of the 1.4-acre parcel of land, sometimes called the Taylor tract, to which the option applied. Unfortunately, the agreement did not address what would happen if the levee project was not completed. The deal was closed on November 30, 2001.

At the time the option was executed, the District intended to use the property solely for the construction of the levee. But, as the poet Robert Burns famously observed,

> The best-laid schemes o' mice an' men,
> Gang aft agley,
> An' lea'e us nought but grief an' pain,
> For promis'd joy!

"To a Mouse, On Turning Her Up in Her Nest With the Plough" (1785). Only two months after signing the agreement, the Common Council of Lawrenceburg passed a resolution withdrawing its funding from the levee project. This unraveled everything: without City funding, the District decided that it could not go forward on its own. It estimated that the cost of completion

was somewhere between $29 and $32 million; it had only $20 million available for the project at the time; and the District did not want to raise taxes.

Left with the property for which it had paid $417,000, the District eventually conveyed it to the City. The City then decided to put it to an alternative use, and a highway bridge now exists on the area that was to be used for the levee project. The parcel described by the option contract is now virtually unusable, because it lies underneath a new extension of Indiana Route 50.

## II

Proceeding by agreement before a magistrate judge, see 28 U.S.C. § 636(c), the parties participated in a bench trial. The district court found that as of the time the agreement was executed, it was not ambiguous, because everyone concerned expected that the levee project would be completed within a reasonable time, and that there would be enough land behind the levee for Metro Family to exercise its option and rebuild its pizza store. When the City decided to withdraw funding for the project, the court concluded, the essential purpose of the agreement failed. Under Indiana law, such an occurrence creates a latent ambiguity in the document. The court thus turned to extrinsic evidence, principally from the negotiating history of the option agreement (which it reviewed in detail in its opinion), and drew from that the conclusion that Metro Family should be entitled to exercise its option even if the levee project was never completed.

The court also found that the District did not defini-
tively decide to abandon the project until as late as Dec-
ember 4, 2003. The evidence indicated that no member
of the District ever communicated to Metro Family
that the option could not be exercised until at least
August of 2005. To the contrary, on several earlier occa-
sions, District representatives expressed the hope to
Metro Family that the project would be resumed or com-
pleted and thus that the option would eventually be
usable. As the court saw it, Metro Family relied on
these representations when it allowed its building to be
demolished, which happened some time after Feb-
ruary 2002.

At the bench trial, Metro Family offered evidence in
an effort to prove that the City's and District's actions
had caused it to suffer a lost future stream of income. The
court, however, found their expert's account to be too
speculative to give it any weight. It also found that Louis
Metro's testimony about the fair market value of the
property on the date of the taking and about the
damage caused to him by the destruction of the building
was too vague to support any conclusions.

The court summarized its findings as follows:

> . . . Metro Family has proven: (1) the existence of an
> Option contract; (2) that the contract contained a
> latent ambiguity; (3) that the intention of the parties
> was to allow Metro Family to exercise the Option if
> the Levee Project was not completed; (4) that [the
> District] breached the Option contract by refusing to
> allow Metro Family to exercise the Option within

eighteen (18) months of [the District]'s final decision not to proceed with the project, which in this case is its decision to convey the Property to the City.

It found that Metro Family was not entitled to money damages for the breach, however, because of a failure of proof. That said, the court found that the market value of the property was "$417,000 *plus* the right to exercise the Option." (Emphasis in original.) Even though there was no evidence of the monetary value of the option, the court thought that reformation of the contract was appropriate, because the parties had made a mutual mistake of fact. It thus ruled, both on that ground and under the theory of promissory estoppel, that Metro Family was entitled to exercise the option within 18 months of the date of its order.

The City and the District appealed from the court's final judgment, and the Metro Family parties cross-appealed from the court's decision to refrain from awarding damages.

### III

### A

Everyone agrees that Indiana law applies in this case. Like the law of every state of which we are aware, it provides that an unambiguous contract should be given its plain and ordinary meaning, *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008), and that no extrinsic evidence is admissible to explain the terms of such an agreement, *Univ. of S. Ind. Found. v.*

*Baker*, 843 N.E.2d 528, 532 (Ind. 2006). When the contract is ambiguous, however, extrinsic evidence is permissible to explain the intentions of the parties. *Reuille*, 888 N.E.2d at 771.

Here, the district court decided that the abandonment of the project created a latent ambiguity that required the use of extrinsic evidence. The court interpreted that evidence to show that both parties intended, through the option contract, to allow Metro Family to buy back the property, whether or not the project was completed. Accordingly, the defendants' failure to allow the plaintiffs to exercise the option within 18 months of the decision to cancel the project was a breach of the contract.

Neither party challenges the conclusion that a breach occurred, and so we do not second-guess it here. Instead, we move directly to the question whether the court abused its discretion by deciding to invoke the equitable remedy of reformation. This can be used in Indiana only (1) when there was a mutual mistake such that the written instrument does not reflect the parties' intentions, or (2) when there has been a mistake on the part of one party accompanied by fraud or inequitable conduct by the other party. *Carr Dev. Group, LLC v. Town of N. Webster*, 899 N.E.2d 12, 13 (Ind. App. Ct. 2008).

The City and the District argue that reformation was inappropriate here, because there was no mutual mistake of fact at the time the option contract was formed. As of then, funding for the project was secure and no one doubted that it would be completed. The City's removal of its funding, they continue, was an

independent future event, and predictions are not a proper basis for reformation. Metro Family responds that both parties were mistaken about a present fact: the security of the funding for the levee project. Had anyone realized that the funding could be revoked so easily, they would have provided for the "no action" possibility in the contract.

The real problem here, no matter what label we use, stems from the fact that the parties to this contract failed to allocate the risk that the levee project would be canceled. In such a situation, on whom should the loss fall? There is an argument that the risk should lie on the party who wants to compel additional compensation—here, Metro Family. Supporters of that view might point to the fact that under Indiana law, the burden of proof with respect to the amount of damages in an eminent domain case lies on the landowner. See, *e.g.*, *Gradison v. State*, 300 N.E.2d 67, 75 (Ind. 1973). On the other hand, it is established in Indiana and elsewhere that "the basic measure of damages in eminent domain cases is the fair market value of the property" at the time of the taking, and that value is "the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." *State v. Bishop,* 800 N.E.2d 918, 923 (Ind. 2003) (internal quotation marks omitted). We know exactly what that price was, in this case, because the October 31 agreement tells us. As the district court properly found, the price had two components: a payment of $417,000 in cash, plus an option to re-purchase for $269,490 specified land behind the levee. If we were to

relieve the District (and now the City, the District's successor in interest) of the obligation to make good on the option, then it would be getting the property for less than its fair market value. There is no doubt that Metro Family sold its property to the District in response to the impending eminent domain proceedings. In the absence of any evidence suggesting that it intended to forgive part of the price if the levee project was abandoned, we think that an Indiana court would probably place the risk of that event's occurrence on the District.

As we read Indiana cases, this is the result that they would reach using the rubric of mutual mistake. The case of *Jay County Rural Electric Membership Corp. v. Wabash Valley Power Association, Inc.*, 692 N.E.2d 905 (Ind. App. Ct. 1998), is helpful in sorting out who has the better argument. The court there summarized Indiana law on mutual mistake:

> [W]here both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if, because of the mistake, a quite different exchange of values occurs from the exchange of values contemplated by the parties . . . . It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is of the essence of the agreement, the *sine qua non*, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.

*Id.* at 158 (internal quotation marks and citations omitted). Here, the district court was justified in regarding the

completion of the project as the central purpose of the agreement.

The City and District have referred us to a number of cases that stand for the unexceptional proposition that predications cannot be the basis of mutual mistake. *E.g., Jay County Rural Elec. Membership Corp.,* 692 N.E.2d at 912; *United States v. Sw. Elec. Coop., Inc.,* 869 F.2d 310, 314 (7th Cir. 1989). But that is not what the district found, nor what Metro Family has argued. Metro Family's assertion is that at the time the agreement was signed there was a mutual mistake of present fact. The mutual mistake was that the project had reached the point beyond which cancellation was out of the question. (One might question how rational this factual assumption really was, because legislative bodies from Congress down to the smallest town council both have and exercise the power to change appropriations when they wish, unless the recipient actually has a vested right in the payment. It is hard to imagine that anyone, least of all Metro Family, had acquired a property right in the planned levee. But no one has made anything of this point, and so we do not either.)

Although Metro Family has suggested that we might affirm the district court on the alternate ground that reformation was appropriate because of a unilateral mistake, induced by fraudulent or inequitable conduct on the defendants' part, we do not believe that the record is sufficiently developed to permit that step. Furthermore, from what we do see before us, the City and District did not engage in behavior so egregious that it would qualify as either fraudulent or inequitable.

The alternate ground that the district court did reach was that of promissory estoppel. Indiana courts have applied this doctrine in the context of commercial con-tracts. *Lyon Metal Prods., Inc. v. Hagerman Const. Corp.*, 391 N.E.2d 1152, 1154-55 (Ind. App. Ct. 1979). Indiana follows section 90 of the Restatement (Second) of Con-tracts, which says:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy for breach may be limited as justice requires.

*Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 121 (Ind. 1994) (quoting the Restatement (Second) of Contracts § 90(1) (1981)). While no special words are necessary to create the kind of promise the Restatement describes, Indiana courts have said that an expression of intention, prediction, opinion, or prophecy is not good enough. *E.g., Medtech Corp. v. Ind. Ins. Co.,* 555 N.E.2d 844, 847 (Ind. App. Ct. 1990).

The district court decided that Metro Family relied on the District's promises to go forward with the project even without the City's support, and that its reliance was reasonable. Metro Family states that, had it not been for the District's promises, it would not have stood by quietly while its building was demolished, and it would have tried to prevent the District from conveying the property to the City. We do not regard this as Metro

Family's strongest argument. It cannot dispute the fact that after the agreement of sale was concluded, the District held title to the property. Under the circumstances, it is not clear how it would have prevented the demolition and transfer. It is better off stressing the simple fact of its undercompensation for its land. In addition, what does appear to be reasonably supported is the fact that the District continued to express hope that the project would go forward until it finally told Metro Family on August 31, 2005, that the District had abandoned the project. On November 17, 2005, the District followed up with a letter saying that Metro Family could not exercise its option to purchase the property.

## B

We thus find no fault in the district court's finding that the District and City breached the October 31 contract (in particular, the option part of that agreement) and that Metro Family is entitled to some kind of remedy for that breach. The difficult question is what remedy is supported by the record and appropriate. The district court found that Metro Family failed to introduce competent evidence of damages, commenting that the expert testimony was "too speculative to base any opinion about what the fair market value of the Metro Family Property is or was, or to establish with any certainty the amount of any income stream lost from an inability to exercise the option."

The plaintiffs had offered a few different estimates of their damages. Their appraiser, Mr. Taylor, reported

that Metro Family had lost close to $1 million in rents. He based his calculation on the fact that Metro Family had received $36,000 in gross annual rent in 2001, and he then adjusted that number upward for inflation each year for a 20-year period. After that, he deducted 10% of the gross income as maintenance expenses for each year. This produced a number for lost rents between 2001 and 2021 of $971,727.35. (Taylor's report was just a five-column, 20-row Excel spreadsheet that provided no explanation of his methodology.) Metro Family's back-up position was that it was entitled to at least $36,000 per year for a 10-year period. If neither of those was acceptable, it urged that it was entitled to lost rents from the period between January 2002 (when the City canceled the funding) and May 2009, when the district court's judgment was entered.

The district court did not recognize the biggest problem with this testimony, which was that it did not address the right thing. Taylor was talking about how much money someone could make by running a pizza shop on that parcel of land, but that amount represents a return to entrepreneurship, not the value of the land (or more precisely the value of the option to purchase the land). The value of the option depends on the difference between what Metro Family could make by selling pizza at that location, compared with what it could earn by selling pizza at the best alternative location. See *Van Zelst v. CIR*, 100 F.3d 1259, 1262-63 (7th Cir. 1996). Taylor offered no opinion about that, and so his evidence was not helpful at all.

This is not to criticize the district court's assessment of the value, or lack thereof, of these estimates; the court was right about that, too. That means that we are left with the fact that Metro Family has already received the $417,000 component of the compensation promised in the October 31 agreement, and that it has yet to receive anything representing the option. As we noted at the outset, the district court thought that the best way to handle this was to reform the contract to change the date by which the option could be exercised, from 18 months after completion of the project to 18 months after the date of the opinion. That would have been a reasonable decision if the 1.4 acres were still available to purchase, from either the City or the District. But it is not. The land itself has not vanished, obviously, but it now lies beneath a spaghetti-bowl of freeway lanes and is utterly inaccessible. It is plainly not a place suitable for a Domino's pizza franchise.

In our view, the closest that one can come to making Metro Family whole for the shortfall in compensation is to determine how much it lost at the moment that the option became impossible to exercise. The record does not show when the highway was built, but that date is important. If highway construction had not yet begun as of November 17, 2005, when the District definitively told Metro Family that it could not exercise its option, then November 17, 2005, is the best date to use. If highway construction had begun, then it will be necessary to look back further to see when the last time an objective assessment of the Taylor tract's value would be possible. If expert testimony shows that the tract on the

relevant date was worth more than the option price of $269,490, then Metro Family suffered a loss equal to the difference between the actual value and the option price; interest would also be due on any such loss, up to the date when the damages are paid. If it was worth the same or less than the option price, then Metro Family did not suffer any damages and it should take nothing.

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion. Costs are to be assessed against the District and the City.

VACATED AND REMANDED.