# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**ANTHONY W. OVERHOLT**
**THOMAS D. PERKINS**
**MAGGIE L. SMITH**
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**WILLIAM N. RILEY**
**JOSEPH N. WILLIAMS**
**JAMES A. PIATT**
Price Waicukauski & Riley, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| VINCENNES UNIVERSITY by the BOARD OF TRUSTEES OF VINCENNES, | ) ) ) | |
| Appellant-Defendant, | ) ) | |
| vs. | ) ) | No. 42A01-1206-PL-248 |
| DANIEL E. SPARKS, | ) ) | |
| Appellee-Plaintiff. | ) ) | |

APPEAL FROM THE KNOX SUPERIOR COURT
The Honorable Dean A. Sobecki, Special Judge
Cause No. 42D01-0705-PL-22

**April 30, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

After an investigation into falsified information on a basketball recruit's application to Vincennes University ("the University"), Daniel Sparks, who was the head basketball coach in August of 2003, agreed that in lieu of facing disciplinary proceedings, he would forfeit his tenure and be subject to a zero tolerance policy. Thereafter the University renewed Sparks's contract for the 2004-2005 academic year, but then notified him that his contract would not be renewed for the 2005-2006 academic year.

Sparks sued the University, contending that the University had to continue to employ him as long as he did not violate the zero tolerance policy. Both parties moved for summary judgment. The trial court denied both motions, and the case was tried to a jury. After Sparks's case-in-chief, the University moved for a directed verdict, which the trial court denied. The jury returned a verdict in Sparks's favor.

The University appeals, arguing that, because Sparks surrendered his tenure, the University was free to decide not to renew his contract for any reason. The University therefore argues that the trial court should have granted its motion for summary judgment, and alternatively, that the trial court should have granted its motion for a directed verdict and that the evidence was insufficient to support the verdict. We conclude that there is no genuine issue of material fact, that the designated evidence indicates that Sparks was not guaranteed continued employment with the University, and that summary judgment should have been granted for the University. We therefore reverse the verdict.

**Facts and Procedural History[1]**

Sparks began working for the University in 1979 as the men's basketball coach, athletic director, and professor of physical education. He became a tenured employee in 1982. In 2003, Sparks recruited a student from South Carolina, whom the parties have referred to as "Student A." Student A did not obtain enough credits to graduate from high school. Student A "transfer[red]" his credits to a school in Philadelphia, which issued him a transcript. Tr. at 131. Sparks's assistant coach, Jayson Holmes, also supplied Student A with an Indiana address to put on his application.[2] When officials in the admissions department investigated Student A's application, it was discovered that Student A had not graduated high school, had not attended the school in Philadelphia, had never lived in Indiana, and did not have any relatives who lived in Indiana.

On June 12, 2003, Sparks and Holmes were called to a meeting with Dale Dowden, who was the University's acting president at the time; Lynn White, assistant provost for student affairs; Jack Hanes, assistant provost for enrollment management; Gazella Summitt, human resources director; and Phillip Pierpont, assistant provost for academic affairs. White was Sparks's direct supervisor, and she reported to Dowden. Student A's application was discussed, and Holmes admitted to putting an in-state address on the application in order to increase the number of students who could receive a basketball scholarship. The coaches

---

[1] We heard oral argument in this case on March 26, 2013, at Valparaiso University Law School. We would like to thank the students, staff, faculty, and administration of the school for their hospitality, and we commend counsel for the quality of their written and oral advocacy.

[2] It appears that this may have happened with more than one basketball recruit, but the designated evidence and evidence at trial focused on Student A's application.

both denied being involved in falsification of the transcript. Sparks and Holmes were instructed not to use in-state addresses for out-of-state students.

According to Dowden, the University's Board of Trustees was inclined to fire Sparks. Dowden and White felt that he deserved a second chance and therefore proposed that Sparks be retained subject to new terms of employment. On August 21, 2003, Dowden, White, Summitt, and Pierpont again met with Sparks and Holmes. Sparks was presented with the following proposal:

CONFIDENTIAL

August 21, 2003

Attention: Coach Dan Sparks

RE: Employment Status

*This is to notify each of you that you will not receive any pay increase for the fiscal year 2003-2004.

*You will each need to provide a letter of acknowledgement to be placed in your personnel file regarding falsification of application relating to a male basketball recruit and the conditions of your employment.

*There will be a zero tolerance for the duration of your employment at Vincennes University. This policy will be outlined by the Vincennes University legal counsel.

*You will forfeit tenure and you have until Monday, August 25, 2003 by 4:30 p.m. to provide to Lynn White in writing the acceptance of this agreement and the acknowledgment for your personnel file. If you choose not to accept this agreement, a recommendation will be presented to the Vincennes University Board of Trustees to terminate your employment effective at the end of the Spring semester, 2004.

*Effective immediately, Coach Sparks will be removed as Athletic Director.

Plaintiff's Ex. 1 (This document will hereafter be referred to as "the Agreement.") Holmes

was presented with a similar proposal. Thus, Sparks and Holmes could either accept the

Agreement or stand on their rights as tenured employees and risk being terminated.

Sparks and Holmes both decided to accept the Agreement. As directed, Sparks

supplied a letter in which he accepted the new terms, but noted that he had not received a

copy of the zero tolerance policy. He also offered the following explanation for his actions:

> I tried to give these students in-state tuition by supplying a false address on the student application for the sole intent of trying to help the basketball program. The program has been falling behind in the past few years in funding for scholarships for players. I did this so there could be more than eight players on scholarship.

Appellant's App. at 24. The Board voted to accept the Agreement on August 27, 2003.

Sparks and Holmes both claimed that they never received the zero tolerance policy, despite

efforts to obtain it, and the University does not claim otherwise.

In July 2004, interim president John Gregg sent Sparks a letter informing him that his

contract would not be renewed for the 2005-2006 academic year. While the evidence was

somewhat conflicting as to who made the final decision not to renew Sparks's contract and

why, the University has not taken the position that Sparks violated the zero tolerance policy.

According to Sparks, Summitt informed him that he would not receive his benefits unless he

opted to retire.[3] In a letter dated October 5, 2004, Sparks stated that he would retire as of July

---

[3] Summitt's testimony appears to indicate that this was pursuant to the University's general employment policies, rather than something that was specific to Sparks:

> THE COURT [asking a question from a juror]: Mrs. Summitt, as an HR person at Vincennes University could you explain, if you can, how benefits would be [a]ffected comparing a terminated employee versus a retired employee?

5

1, 2005. At his request, his decision to retire was not made public until after the end of the basketball season.

On May 29, 2007, Sparks filed a complaint against the University alleging breach of contract and promissory estoppel. Sparks filed a motion for partial summary judgment, and the University filed a cross-motion for summary judgment. Thereafter, Sparks filed an amended complaint in which he substituted a fraud claim for the promissory estoppel claim. The University filed a new motion for summary judgment, and Sparks filed a cross-motion for partial summary judgment.

The designated evidence included various depositions, declarations, and affidavits from Sparks and several University officials. Sparks acknowledged that he had forfeited his tenure, but contended that statements from University officials had led him to believe that he would not be treated like a typical non-tenured employee. University officials generally indicated their understanding that the University had retained the right not to renew Sparks's contract, while acknowledging that his employment potentially could have continued indefinitely.

The designated evidence also included the Agreement, the contract that Sparks signed for the 2004-2005 academic year, and the section of the University Manual regarding

---

[SUMMITT]: I'll try. It's been a while since I've been in that position. A terminated employee, if he was eligible for retirement, would be allow[ed] to take retirement with benefits if he or she qualified. And there was a policy that you … had to have at least 20 years of experience to have benefits. And if you were going to retire you also had to have the equivalent of … 85, meaning years of service and age had to add up to 85. If an employee was terminated for what was considered a grievance decision there may not be any benefits allowed.

Tr. at 288.

6

employment. The manual states: "Tenured faculty receive a letter of agreement indicating salary adjustments annually. Contracts are issued annually to non-tenured persons." Appellant's App. at 105. It further states:

> The employment of a non-tenured faculty person shall be terminated by the University before the expiration date of the person's written contract only for reason of incompetence, serious personal or professional misconduct, or insubordination by the faculty person. This termination of a non-tenured faculty person is to be distinguished from the non-renewal of the non-tenured faculty person's contract, as non-tenured faculty persons are to have no expectation of employment after the expiration of each one-year contract.

*Id*. at 107.

On March 28, 2011, both parties' summary judgment motions were denied. The case proceeded to a jury trial, which took place from May 2 through May 4, 2012. At the close of Sparks's case-in-chief, Sparks and the University both moved for a directed verdict, which the trial court denied. At the close of evidence, Sparks withdrew his claim for fraudulent inducement, and only the breach of contract claim was submitted to the jury. The jury returned a verdict in Sparks's favor. The University now appeals.

**Discussion and Decision**

The University argues, alternatively, that: (1) the trial court should have granted its motion for summary judgment; (2) the trial court should have granted its motion for a directed verdict; and (3) the evidence is insufficient to sustain the verdict. The University's arguments regarding summary judgment, the motion for directed verdict, and the sufficiency of the evidence are all based on the University's interpretation of the Agreement. In a nutshell, the University's argument is that the provision of the Agreement that states that

Sparks would forfeit tenure means that he was on a year-to-year contract, and the University was free to renew or not renew his contract each year as it saw fit. The University argues that the zero tolerance policy allowed the University to terminate Sparks's employment during the academic year for cause. Sparks contends that the Agreement is ambiguous and that extrinsic evidence supports a conclusion that he was entitled to continued employment as long as he did not violate the zero tolerance policy.

We conclude that the Agreement unambiguously requires Sparks to forfeit his tenure and that he therefore had no right to continued employment. Even if we were to find the Agreement to be ambiguous, the designated evidence supports the University's interpretation, which also better harmonizes the provisions of the Agreement. Therefore, we conclude that summary judgment should have been granted for the University.

When reviewing a ruling on a motion for summary judgment, our standard of review is the same as it is for the trial court. *Reed v. Reid*, 980 N.E.2d 277, 285 (Ind. 2012).

> Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The party moving for summary judgment has the burden of making a prima facie showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Once the moving party meets these two requirements, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact by setting forth specifically designated facts. We must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the nonmoving party, and resolve all doubts against the moving party.

*Ryan v. Brown*, 827 N.E.2d 112, 116-17 (Ind. Ct. App. 2005) (citations and quotation marks omitted). "[T]he fact that the parties have made cross-motions for summary judgment does not alter our standard of review. Rather, we consider each motion to determine whether the

8

moving party is entitled to judgment as a matter of law." *Blasko v. Menard, Inc.*, 831 N.E.2d 271, 273 (Ind. Ct. App. 2005) (citation omitted), *trans. denied* (2006).

"Summary judgment is especially appropriate in the context of contract interpretation because the construction of a written contract is a question of law." *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1287-88 (Ind. Ct. App. 2009).

> When the language of a written contract is not ambiguous, its meaning is a question of law for which summary judgment is particularly appropriate. In interpreting an unambiguous contract, we give effect to the intentions of the parties as expressed in the four corners of the instrument. Clear, plain, unambiguous terms are conclusive of that intent. We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties.

*Kaghann's Korner, Inc. v. Brown & Sons Fuel Co.*, 706 N.E.2d 556, 565 (Ind. Ct. App. 1999) (citations omitted), *clarified on reh'g on other grounds*. A contract is not ambiguous merely because the parties disagree as to its proper construction; rather, a contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms. *Trs. of Ind. Univ. v. Cohen*, 910 N.E.2d 251, 257 (Ind. Ct. App. 2009). "We interpret a written contract by reading the contract as a whole, and we attempt to construe the language so as to not render any words, phrases, or terms ineffective or meaningless." *DLZ Indiana, LLC v. Greene Cnty.*, 902 N.E.2d 323, 327 (Ind. Ct. App. 2009). "And, in reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements." *Id.* at 328.

The University argues that the "terms 'tenure' and 'non-tenured' are terms of art, well defined in the law and in common usage." Appellant's Br. at 22. Black's Law Dictionary

defines tenure as a "status afforded to a teacher or professor as a protection against summary dismissal without sufficient cause" or "[m]ore generally, the legal protection of a long-term relationship, such as employment."[4]   BLACK'S LAW DICTIONARY 1509 (8th ed. 2004).

The University compares this case to *Orem v. Ivy Tech State College*, 711 N.E.2d 864 (Ind. Ct. App. 1999), *trans. denied* (2000).   Orem was hired by Ivy Tech as an at-will employee.   In 1991, he filed three internal grievances regarding the conditions of his employment.   The parties resolved the dispute by signing a "Release Agreement," which stated:

> In consideration of the agreement of Ivy Tech to accept Mr. Orem's proposal to withdraw his grievances and be assigned the position of Director of Institutional Research and Development, which Mr. Orem is not otherwise entitled to receive, Mr. Orem hereby unconditionally releases and discharges Ivy Tech from any claims.…

*Id*. at 870.   In 1996, Orem was notified that his position would be eliminated due to a reorganization.   Orem submitted a written objection and then requested appointment to an administrative position at the Logansport campus.   That request was denied.   Orem then filed a complaint alleging breach of contract and constructive fraud.   Orem and Ivy Tech both filed motions for summary judgment, and the trial court granted summary judgment for Ivy Tech.

---

[4] In support of its argument that the term "tenure" is well-defined, the University also cites several cases interpreting Indiana's Teacher Tenure Act.  *See Bd. of Sch. Comm'rs of the City of Indianapolis v. Walpole*, 801 N.E.2d 622, 625 (Ind. 2004) (permanent teachers had "a property interest in their jobs" and termination "must comport with due process requirements"); *Aplin v. Porter Sch. Twp. of Porter Cnty.*, 413 N.E.2d 999, 1003 (Ind. Ct. App. 1980) (a permanent teacher's employment could be terminated for the reasons listed in the Teacher Tenure Act and pursuant to the procedures outlined by the Act); *N. Miami Educ. Ass'n v. N. Miami Cmty. Sch.*, 736 N.E.2d 749, 757 (Ind. Ct. App. 2000) (a nonpermanent teacher had "no contractual right to continued employment"), *clarified on reh'g on other grounds*, *trans. denied* (2001).  The University acknowledges that the Teacher Tenure Act does not apply to public universities, but argues that it is illustrative of the common understanding of the meaning of "tenure."  Because these cases are interpreting a highly specific statutory scheme that is not applicable to this case, we find them to have little persuasive value.

On appeal, Orem argued that the words "assigned" and "entitled" meant that he was given a permanent position. *Id*. at 871. We disagreed:

> As used here, the word "assigned" simply means "appointed," i.e., that Orem would be appointed to the position. The phrase "not otherwise entitled to receive" means that Orem would not have been appointed to the position but for the agreement, not that Orem was given an entitlement or right to employment.

*Id*. We noted that "Indiana has historically recognized two basic forms of employment: (1) employment for a definite or ascertainable term, and (2) employment at will." *Id*. at 870. If an employment contract makes no reference to a term of employment, there is a presumption that the employment is at will and can be terminated at any time, with or without cause, by either party. *Id*. We distinguished cases where the presumption had been rebutted because the Release Agreement "contain[ed] no promise of job security" and "d[id] not contain a tenure provision." *Id*. at 871. We declined to "add a material term regarding job-security which does not appear in the Release Agreement." *Id*.

In this case, the Agreement required Sparks to forfeit his tenure. The Agreement made no reference to a term of employment. After entering the Agreement, Sparks signed a contract "for a period commencing on August 15, 2004, and ending on May 15, 2005." Plaintiff's Ex. 7. *Orem* is not squarely on point because Sparks had a contract for the length of the academic year, which could be terminated only under certain limited circumstances; thus, he was not an at-will employee. However, *Orem* makes clear that our courts are reluctant to infer a promise of continued employment that is not clearly expressed in the contract. We find nothing in the Agreement or the 2004-2005 academic year contract that

11

evinces an intent to guarantee Sparks's employment beyond the contract term as long as he committed no misconduct.

Sparks attempts to avoid the clear import of the Agreement's requirement that he forfeit his tenure by focusing on the provision which states that he would be subject to a zero tolerance policy for the duration of his employment. Sparks argues that the words "duration" and "zero tolerance policy" are ambiguous. However, that provision of the Agreement is not at issue. The University did not fire Sparks for violating the zero tolerance policy.

Sparks's argument that the "zero tolerance policy" provision implies that the University would continue to employ him as long as he did not commit any misconduct is problematic because it would, in effect, afford him at least a modified form of tenure. However, the Agreement says nothing about modifying his tenure rights or creating some sort of hybrid form of employment; it says quite plainly that he would "forfeit" his tenure. Plaintiff's Ex. 1. We agree with the University that Spark's interpretation renders meaningless the tenure forfeiture provision. The University argues, and we agree, that the provisions regarding tenure and the zero tolerance policy can be harmonized by interpreting the Agreement to mean that Sparks had a year-to-year contract with the University and could also be fired during the academic year for violation of the zero tolerance policy.

Even if we were to find that the Agreement is ambiguous, the extrinsic evidence supports the University's interpretation of the Agreement. First, the University Manual states:

> Tenured faculty receive a letter of agreement indicating salary adjustments annually. Contracts are issued annually to non-tenured persons.

12

….

> Contracts for faculty not having been awarded tenure are only for the time specified in each of said contracts. Until tenure is granted, faculty shall have no expectation of continued employment after the duration of the contract, as the University expressly retains its right not to renew the contract.

….

> Non-tenure appointments for faculty who are in tenure-track positions but who have not been awarded tenure will be employed for one year at a time and their employment will not exceed five years.

….

> The employment of a non-tenured faculty person shall be terminated by the University before the expiration date of the person's written contract only for reason of incompetence, serious personal or professional misconduct, or insubordination by the faculty person. This termination of a non-tenured faculty person is to be distinguished from the non-renewal of the non-tenured faculty person's contract, as non-tenured faculty persons are to have no expectation of continued employment after the expiration of each one-year contract.

Appellant's App. at 105-07.

The University Manual clearly supports the University's interpretation of the Agreement. Pursuant to the University Manual, Sparks, as a non-tenured employee, was on a year-to-year contract, and the University had the right to determine whether or not to renew the contract. He had no expectation of continued employment after the expiration of each one-year contract. The parties' course of dealings indicates that they were following the policies set out in the University Manual. For the 2004-2005 academic year, Sparks was offered a one-year contract, which he signed. There is no indication that he objected to receiving a contract for a specific term or expressed at that time a belief that he had been

13

guaranteed continued employment. The contract states that Sparks's employment "may be terminated by the University before the expiration date of this contract for reasons of incompetence, serious personal or professional misconduct, or insubordination by the Employee." *Id.* This language tracks language in the University Manual regarding non-tenured employees.

Sparks relies on Dowden's deposition, in which he testified as follows:

Q Back to that third paragraph again in the [Agreement]. It says, "There will be a zero tolerance for the duration of your employment." What did Vincennes mean by the duration of your employment?

A Well, at the time we anticipated – I can't speak for anyone else – it was my expectation that if the Board would accept these conditions, and we did not know initially whether they would, but they did, and if Mr. Sparks would find himself able to live within these, that his employment there could have gone on indefinitely.

Appellant's App. at 303-04. In White's deposition, she was asked if she agreed with this statement from Dowden, and she indicated that she did.

Dowden's statement that Sparks's employment *could* have gone on indefinitely is not inconsistent with the University's interpretation of the Agreement: the University could have continued renewing his contract, but it was not required to. To the extent that this statement expresses a hope or expectation that Sparks's employment would in fact continue indefinitely, Sparks fails to explain how Dowden's personal hopes could be binding on the University.

At several points in his deposition and affidavit, Sparks claimed that Dowden made statements that led him to believe that he would not be treated like a non-tenured employee.

*See* Appellant's App. at 48 (in his affidavit, Sparks stated that Dowden and White told him "that this discipline was all that I would receive, and that the situation was over as far as the University was concerned"); *id.* at 135 (in his deposition, Sparks says that Dowden told him, "This is all behind us. If you agree to this, this time next year, it will all be forgotten."); *id.* at 162 (again in his deposition, Sparks says, "In the meeting with Dale Dowden, it was explained to me that if I didn't break the zero tolerance, it would all be forgotten and everything would be moving forward."). However, when he was questioned further about this claim, he testified as follows:

> Q So why did you choose to accept the school's conditions for remaining at the University?
>
> A We had been there for 25 years. We did not have anything in our files pertaining to anything we had ever done wrong, only letters of support about things that we had done good [sic]. And in the meeting, Dale Dowden expressed that, you know, we would get the zero tolerance, and this time next year it would all be forgotten and we would move forward.
>
> Q But you understood that – at that point, that when the next year came around, you wouldn't have tenure?
>
> A Right.
>
> Q So at that point, without tenure –
>
> A He told us in that meeting that we could reapply for tenure.
>
> Q My question is, after – as you left that meeting, you knew that if you accepted the agreement, you wouldn't have tenure for that following year; right?
>
> A Right.
>
> Q So at that point you would – you knew, again, if you accepted it, that you would be without any job protections to keep your job for further years?

15

A  Right.

Q  And that the University could dismiss you for any reason or no reason at all at the completion of your one-year contract?

A  Right.

*Id*. at 138-39.

This testimony clearly demonstrates that Sparks understood that giving up his tenure meant giving up his job security. To the extent that isolated portions of his deposition and affidavit contradict this testimony, this contradictory testimony does not create a genuine issue of material fact. Sparks cannot create a genuine issue of material fact by contradicting himself. *See Crawfordsville Square, LLC v. Monroe Guar. Ins. Co.*, 906 N.E.2d 934, 939 (Ind. Ct. App. 2009) (a party cannot "generat[e] its own genuine issue of material fact by providing self-serving contradictory statements without explanation"; if such practice were allowed, it would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact"), *trans. denied*.

In sum, we conclude that the Agreement unambiguously stripped Sparks of his job protections, and the University therefore was not obligated to continue renewing his contract. However, even if the Agreement were considered ambiguous, the designated evidence does not create a genuine issue of material fact, and that evidence supports the University's interpretation rather than Sparks's. Therefore, we conclude that summary judgment should have been granted for the University. We reverse the verdict.

Reversed.

MAY, J., and BRADFORD, J., concur.

16