In the

# United States Court of Appeals

### For the Seventh Circuit

No. 19-1070

DIVISION SIX SPORTS, INC.,

*Plaintiff-Appellant,*

*v.*

THE FINISH LINE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 1:17-cv-03879 — **Sarah Evans Barker**, *Judge.*

ARGUED MAY 23, 2019 — DECIDED JUNE 27, 2019

Before BAUER, MANION, and BRENNAN, *Circuit Judges.*

MANION, *Circuit Judge.* This case involves an alleged breach of contract between Plaintiff Division Six Sports, Inc. ("Division Six") and Defendant The Finish Line, Inc. ("Finish Line"). The district court dismissed the case for failure to state a claim, holding the contract was not in force at the time of the alleged breach. Division Six argues on appeal that the district court misinterpreted the contract's automatic renewal

provision. For the reasons below and those explained in the district court's thorough analysis, we affirm.

## I. Background

Finish Line is a large retailer of athletic shoes, apparel, and accessories. Through the course of its business, Finish Line generates a stock of surplus goods that includes aged merchandise (products that do not sell over time) and customer-returned merchandise. Division Six specializes in the resale of both aged and customer-returned athletic wear products.

In 2001, Finish Line and Division Six entered an agreement by which Division Six received the exclusive right to purchase aged and customer-returned merchandise from Finish Line (the "Agreement"). Paragraph 9 of the Agreement provided for an 18-month term "commencing on March 1, 2001" that could be extended by written agreement of the parties "prior to the expiration of the term or any extension thereof." *See* App'x A. Paragraph 9 also gave Division Six a right of first refusal if Finish Line received a bona fide arms-length offer from a third party to purchase its surplus merchandise within six months prior to the term's expiration. If Finish Line did not receive such an offer, the Agreement would "automatically renew for an additional eighteen (18) month term." *Id.*

In 2002, the parties amended the Agreement (the "2002 Amendment"). One effect of this amendment was to modify Paragraph 9. The modification was set forth in a letter written by Finish Line, which stated:

> Finish Line would be amenable to adding language to Paragraph 9 of the Purchase Agreement to reflect a three year (3) extension of the agreement (ie. [sic] through August 31, 2005). In addition, should Finish

Line not receive a bona fide, arm's length written offer from any third party at any time within six months of the end of said extended term, then the Agreement will automatically renew for an additional three (3) year extension.

Both parties further agree that no other provisions of the Agreement shall be modified by this letter, and that all other terms and conditions of the Agreement shall remain in full force and effect and are hereby reaffirmed by the parties.

The Agreement was not re-drafted to reflect the language change contemplated in this letter. Instead, the letter itself served to memorialize the modification agreed to by the parties and was signed by both parties. The new extended term ran to the stated date of August 31, 2005, at which point it automatically renewed for a second three-year extension until August 31, 2008, all pursuant to the 2002 Amendment.[1]

In September 2008, Finish Line proposed another amendment (the "2008 Amendment"), once again by letter. This letter included the following:

Finish Line would be amenable to adding language to Paragraph 9 of the Purchase Agreement to reflect a new five (5) year term extension, commencing September 1, 2008 and ending December 31, 2013 … unless sooner terminated pursuant to any provisions of the Governing Agreements.

---

[1] A second amendment was agreed upon in 2003, but it had no effect on Paragraph 9 and thus warrants no further discussion.

The 2008 Amendment further provided that "no other provisions of the Governing Agreements shall be modified by this … Amendment, and that all other terms and conditions of the Governing Agreements shall remain in full force effect [sic] and are hereby reaffirmed by both parties."

Despite the 2008 Agreement's express ending date of December 31, 2013, Finish Line continued to ship products to Division Six in 2014. However, Finish Line eventually stopped dealing with Division Six and began dealing with other parties instead. In January 2015, Division Six wrote to Finish Line asserting its exclusive right under the Agreement to purchase Finish Line's surplus products. Finish Line asserted in response that the Agreement was no longer in effect, having terminated in December 2013 following the end of the 2008 Amendment's five-year extension.

Division Six filed suit in October 2017. Finish Line moved to dismiss for failure to state a claim, arguing the Agreement terminated at the end of 2013. In its complaint and in opposition to the motion to dismiss, however, Division Six claimed the Agreement had in fact automatically renewed for another three years at the end of 2013. Division Six argued the Agreement and its amendments created a perpetual self-renewal process triggered by the end of each extended term so long as Finish Line did not receive a third-party offer.

The district court granted Finish Line's motion to dismiss. The court noted the terms set forth in the original Agreement and the 2002 Amendment were expressly tied to specific dates and ran for specific lengths of time. According to the court, the automatic extension provisions of each applied specifically to those defined terms and only provided for a single extension following each term. Thus, the Agreement did not

provide for perpetual self-renewal. Furthermore, since the 2008 Amendment did not provide for any automatic extension, the court held the Agreement expired in 2013.

The court also rejected Division Six's alternative argument that the contract was ambiguous about automatic renewal. Since the plain language was not ambiguous, the court refused to consider Division Six's extrinsic evidence of the parties' intent—namely, Finish Line's continued shipments to Division Six in 2014 after the Agreement had allegedly expired.

In October 2018, Division Six moved for reconsideration pursuant to Fed. R. Civ. P. 59(e). It argued the district court committed an error of law by not "extending its reasoning" to conclude that even if the Agreement did not provide for perpetual self-renewal, the 2002 Amendment provided for one final automatic renewal following the end of the 2008 extended term. Therefore, the Agreement renewed a final time in 2014. The district court rejected this argument and held its decision not to adopt Division Six's interpretation was not "manifestly wrong." *See Cincinatti Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (requiring a movant under Rule 59(e) to demonstrate "a manifest error of law or fact" committed by the court). The court denied the motion for reconsideration. Division Six appeals the dismissal of its case.

## II.  Discussion

Our review of the district court's dismissal for failure to state a claim is *de novo*, drawing all reasonable inferences in favor of Division Six as the non-moving party and accepting its factual allegations as true. *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 342 (7th Cir. 2018).

The parties agree the contract is governed by Indiana law, so we need not examine the choice-of-law question further. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 427 (7th Cir. 1991). The goal of contract interpretation under Indiana law is to determine the parties' intent. *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014). To do so, "an unambiguous contract should be given its plain and ordinary meaning … and … no extrinsic evidence is admissible to explain the terms of such an agreement." *Louis & Karen Metro Family, LLC v. Lawrenceburg Conservancy Dist.*, 616 F.3d 618, 622 (7th Cir. 2010). If the contract is ambiguous, however, extrinsic evidence may be presented to determine the parties' intent. *Id.*

On appeal, Division Six has chosen not to reassert the perpetual-renewal theory. Instead, it relies on the theory it argued in its motion to reconsider: Division Six was entitled to one more automatic three-year extension at the end of December 2013. As the district court noted, an issue raised for the first time in a Rule 59(e) motion that could have been raised earlier is generally not preserved for review. However, "such an issue is subject to appellate review if the district court exercises its discretion to consider the issue on the merits." *Gerhartz v. Richert*, 779 F.3d 682, 686 (7th Cir. 2015) (quoting *Dyson v. District of Columbia*, 710 F.3d 415, 419 (D.C. Cir. 2013)). Finish Line has conceded the argument is preserved for our review.

Alternatively, Division Six argues the Agreement is ambiguous about whether one more extension occurred in December 2013. It asserts the district court should have considered extrinsic evidence of the parties' intent.

Regarding the ambiguity argument, Division Six points to the phrase "adding language" used in both the 2002 and 2008 Amendments. It asserts this phrase is ambiguous because the district court and Finish Line interpreted it differently than Division Six. However, "[a] contract is not ambiguous merely because the parties disagree as to its proper construction; rather, a contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." *Vincennes Univ. ex rel. Bd. of Trs. v. Sparks*, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013). Our question, then, is whether the Agreement and its amendments are susceptible to multiple reasonable interpretations.

The interpretation that Division Six proposes is not a reasonable one. Division Six argues that, because the amendments each purported to "add" language to the Agreement while leaving all other terms in full force and effect, the modified Agreement could reasonably be understood to strike out and replace incongruous language related to term lengths and automatic extensions. This, it asserts, would allow for a final automatic extension after December 2013.

To illustrate its position, Division Six provided us with two separate modified versions of Paragraph 9 (included with this opinion as appendices). The first supplements the original Paragraph 9 by deleting the specific language defining the original term length, dates, and the automatic extension length. It then replaces them with the 2002 Amendment's extended term length as well as the automatic extension length (three years). This modified version also adds the word "extended" before every subsequent mention of the word "term" in Paragraph 9. The apparent intent is that each provision of the paragraph may be understood to relate to the new

extension rather than the original term. For example, the phrase "If within six (6) months prior to the end of the term" in the original Agreement is changed to "If within six (6) months prior to the end of the extended term" in the modified version. Notably, Division Six's modified Paragraph 9 does not include the 2002 Amendment's language tying the three-year automatic extension to "the end of *said* extended term" (emphasis added). *See* App'x B.

The second modified version begins with the first modified version but now deletes the term length and ending date that had been added by the 2002 Amendment and replaces them with the five-year extension set forth in the 2008 Amendment. Because the 2008 Amendment made no mention of another automatic extension, the language providing for a three-year extension is left intact. The result is that the three-year extension now applies to "the end of the extended term," which, in this second modified version, would be the five-year extension ending in December 2013. *See* App'x C.

Thus, Division Six argues the final result of the Agreement as modified by both amendments required one final automatic renewal after December 2013.

The problem with this interpretation is that nothing in the amendments evidences an intent to strike out the language relating to the previous terms' lengths or the dates to which the terms were anchored. The amendments only state an intent to "add" language, which ordinarily does not mean to delete. *See generally Add*, Webster's Third New International Dictionary Unabridged (1981). Absent a clear indication to the contrary, we must construe the words in a contract according to their ordinary meaning. *THQ Venture v. SW, Inc.*, 444 N.E.2d 335, 338–39 (Ind. Ct. App. 1983).

Nor do the amendments say anything about adding the word "extended" to change the meaning of Paragraph 9 the way Division Six has proposed. *See Evan v. Poe & Assocs., Inc.*, 873 N.E.2d 92, 98 (Ind. Ct. App. 2007) (holding a court may not "add provisions [to a contract] not agreed upon by the parties"). The 2002 Amendment expressly defined the extended term it created and anchored it to the beginning date of September 2002. It then created an automatic extension provision that applied to a specific term, i.e. "said extended term," not *any* extended term. Division Six's proposed interpretation ignores this.

Indeed, in another portion of the original Paragraph 9, where the Agreement contemplates the parties agreeing in writing to an extension, the Agreement specifically stated this could occur "prior to the expiration of the term or any extension thereof." The parties could have used this same language if they intended the automatic renewal provision to apply to any extension of the original term, but they did not.

Furthermore, the three-year automatic extension in the 2002 Amendment already occurred at the end of the 2002 Amendment's first three-year extended term in 2005, resulting in an extension to 2008. Division Six's argument requires the court to read into the parties' agreement the idea that the automatic extension provision was revived and reapplied after the 2008 Amendment's five-year extension. This is not a reasonable interpretation of the parties' Agreement.

The only reasonable interpretation is that each automatic renewal provision applied to the specific term or extension to which it was expressly attached. Thus, the original Agreement, the 2002 Amendment, and the 2008 Amendment together created the following sequence of events:

(1) An 18-month term lasting from March 2001 until September 2002, which could, but ultimately did not, automatically renew for one additional 18-month extension;

(2) A three-year extension lasting from September 2002 until August 2005, which could, and did, automatically renew for one additional three-year extension until August 2008; and finally

(3) A five-year extension lasting from September 2008 until December 2013, without any further provision for automatic renewal.

Because the Agreement is clear and unambiguous, Divisions Six's extrinsic evidence (that Finish Line continued to perform in 2014) is irrelevant and cannot be considered. *Tender Loving Care*, 14 N.E.2d at 72. There was no automatic extension provided for following the 2008 Amendment extension. Thus, the Agreement was no longer in force after December 2013 and Finish Line did not commit a breach when it began dealing with third parties in 2014.

### III. Conclusion

The Agreement and its amendments are not ambiguous, and the plain language did not provide for any extension after the end of 2013. The district court, in its thorough and well-reasoned opinion, properly dismissed the action for failure to state a claim. Accordingly, we AFFIRM the decision of the district court.

**APPENDIX A**

Original Paragraph 9 of the Agreement:

TERM OF AGREEMENT

The term of this Agreement shall be eighteen months (18) commencing on March 1, 2001 (the Effective Date). The term may be extended by the written agreement of the parties prior to the expiration of the term or any extension thereof. If within (6) months prior to the end of the term, Finish Line shall receive a bona fide, arm's length written offer from any third party to purchase the same or similar Finish Line Products that Division Six Sports is purchasing under the terms of this Agreement, then Division Six Sports shall have a right of first refusal for an additional eighteen (18) month period to extend this Agreement with Finish Line upon materially identical consideration and terms set forth in such third party's written offer …. If Finish Line does not receive a bona fide, arm's length written offer at any time within six months of the end of the term, then this Agreement will automatically renew for an additional eighteen (18) month term.

**APPENDIX B**

2002 Amendment Relevant Part:

Finish Line would be amenable to adding language to Paragraph 9 of the Purchase Agreement to reflect a three year (3) extension of the agreement (ie. Through August 31, 2005). In addition, should Finish Line not receive a bona fid, arm's length written offer from any third party at any time within six months of the end of said extended term, then the Agreement will automatically renew for an additional three (3) year extension.

Division Six's First Modified Version of Paragraph 9:

TERM OF AGREEMENT

The term of this Agreement shall be ~~eighteen months (18) commencing on March 1, 2001 (the Effective Date)~~ **extended by three (3) years (i.e., through August 31, 2005)**. The term may be extended by the written agreement of the parties prior to the expiration of the term or any extension thereof. If within (6) months prior to the end of the **extended** term, Finish Line shall receive a bona fide, arm's length written offer from any third party to purchase the same or similar Finish Line Products that Division Six Sports is purchasing under the terms of this Agreement, then Division Six Sports shall have a right of first refusal for an additional ~~eighteen (18) month~~ **three-year** period to extend this Agreement with Finish Line upon materially identical consideration and terms set forth in such third party's written offer …. If Finish Line does not receive a bona fide, arm's length written offer at any time within six months of the end of the **extended** term, then this Agreement will automatically renew for an additional ~~eighteen (18) month term~~ **three (3) year extension**.

**APPENDIX C**

2008 Amendment Relevant Part:

Finish Line would be amenable to adding language to Paragraph 9 of the Purchase Agreement to reflect a new five (5) year term extension, commencing September 1, 2008 and ending December 31, 2013, ("Third Amendment Extended Term") unless sooner terminated pursuant to any provisions of the Governing Agreements.

Division Six's Second Modified Version of Paragraph 9:

TERM OF AGREEMENT

The term of this Agreement shall be extended by ~~three (3)~~ **five (5)** years ~~(i.e., through August 31, 2005)~~ **commencing September 1, 2008 and ending December 31, 2013, ("Third Amendment Extended Term") unless sooner terminated pursuant to any provisions of the Governing Agreements**. The term may be extended by the written agreement of the parties prior to the expiration of the term or any extension thereof. If within (6) months prior to the end of the extended term, Finish Line shall receive a bona fide, arm's length written offer from any third party to purchase the same or similar Finish Line Products that Division Six Sports is purchasing under the terms of this Agreement, then Division Six Sports shall have a right of first refusal for an additional three-year period to extend this Agreement with Finish Line upon materially identical consideration and terms set forth in such third party's written offer …. If Finish Line does not receive a bona fide, arm's length written offer at any time within six months of the end of the extended term, then this Agreement will automatically renew for an additional three (3) year extension.